NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11128


COMMONWEALTH  vs.  CLYDE HOWARD.



Middlesex.     February 7, 2014. - October 2, 2014.

Present:  Spina, Botsford, Gants, & Lenk, JJ.


Constitutional Law, Admissions and confessions, Voluntariness of
     statement, Waiver of constitutional rights, Harmless error.
     Waiver.  Error, Harmless.  Evidence, Admissions and
     confessions, Voluntariness of statement, Prior misconduct,
     Argument by prosecutor, Intoxication.  Practice, Criminal,
     Motion to suppress, Admissions and confessions,
     Voluntariness of statement, Waiver, Harmless error,
     Argument by prosecutor, Instructions to jury.




     Indictments found and returned in the Superior Court
Department on March 19, 2009.

     A pretrial motion to suppress evidence was heard by Wendie
I. Gershengorn, J., and the cases were tried before her.


     Robert F. Shaw, Jr., for the defendant.
     Jamie M. Charles, Assistant District Attorney, for the
Commonwealth.


     BOTSFORD, J.  A Superior Court jury found the defendant,

Clyde Howard, guilty of murder in the first degree on theories

of deliberate premeditation and extreme atrocity or cruelty.[1] The defendant appeals his conviction, arguing that: (1) the motion judge erred in denying his pretrial motion to suppress statements that he made to police both on the day of his arrest and on the following day during an interview with police; (2) the Commonwealth impermissibly focused on prior bad acts and character evidence during trial; (3) statements made by the prosecutor during his closing argument prejudiced the defendant and warrant a new trial; and (4) the jury instructions on mental impairment and the voluntariness of the defendant's statements were erroneous and warrant reversal of his convictions. Pursuant to our review of the entire case under G. L. c. 278, § 33E, we conclude that the erroneous admission of portions of the defendant's statement to the police, combined with other errors, require reversal of the defendant's conviction of murder in the first degree. On remand, at the Commonwealth's option, a verdict of murder in the second degree may be entered in lieu of a new trial on the first degree murder indictment.

1. _Background_. We recite the facts as the jury could have found them, reserving other facts for later discussion. On the morning of January 28, 2009, the victim, Maurice Ricketts, was

---

[1] The jury also found the defendant guilty of unlawful possession of a firearm; unlawful possession of ammunition; and discharging a firearm within 500 feet of a building. The defendant does not contest those convictions in this appeal.

shot in the head and killed while at his job at Baystate Pool Supplies (Baystate), a pool supply distributor located in Cambridge. He was shot by the defendant, who worked at Baystate as a handyman.

Earlier that morning, at around 9 A.M., the defendant was asked by the Baystate branch manager Derek Roczynski and operations manager Michael Najarian, Jr., to buy breakfast for them at a local fast food restaurant.[2] After breakfast, Najarian joined the victim in the warehouse known to Baystate employees as the "chemical building," located directly across the street from Baystate's offices and other warehouses. Shortly after 10 A.M., the defendant entered the front door of the chemical building carrying a bag of trash. Singing and joking with Najarian as he passed, he walked down a pathway toward the back exit and out to the dumpster. This outdoor area was known to employees as the "chemical backyard" (chemical yard). After taking out the trash, the defendant returned through the chemical building and proceeded to leave through the front door, but then turned around, reentered, and exchanged words with the victim who was working nearby. Najarian heard an "explosion of

---

[2] The defendant claimed that after he returned from buying breakfast, and before the shooting took place, the victim came at him with a hammer. At trial, Michael Najarian testified that the only hammers at Baystate Pool Supplies (Baystate) were located in his office.

yelling" between the defendant and victim, and he approached them, "scream[ing]" for them to stop. Within moments, the defendant reached into his right pocket, pulled out a gun, and pointed it at the victim, who turned and ran through the warehouse toward the back door leading to the chemical yard. The defendant fired once, missing the victim, and then quickly followed him. Najarian shouted twice at the defendant to "stop it"; each time, the defendant responded, "What?", but continued to pursue the victim while looking straight ahead toward the back door.

After the two men ran out of the warehouse, Najarian ran to the company offices across the street where he alerted Roczynski and assistant manager James McGaffigan before telephoning 911. Roczynski and McGaffigan immediately ran toward the chemical building but heard shots coming from the chemical yard before they reached the building entrance. They ran along the building toward the chemical yard and peered through an opening in the locked fence. There, they saw the defendant facing the back of the dumpster with his arm outstretched and pointed slightly downward, and then heard two additional shots. After each shot, Roczynski heard the victim make a grunting sound and, after the second, also heard the defendant mutter, "I got you." Roczynski then shouted, "[W]hat the f are you doing"; the defendant briefly glared at him. McGaffigan saw the defendant walk toward

the back door, stop, return to the dumpster area, and fire an additional shot.  Roczynski and McGaffigan returned to the entrance of the chemical building and Roczynski bumped into the defendant who was coming out of the door.  The defendant muttered, "I got to get out of here," ran to a white van, and drove away.

Roczynski, McGaffigan, and other Baystate workers rushed to the chemical yard where they found the victim behind the dumpster, wedged between a stack of wood pallets.  He had suffered two gunshot wounds to the head.  Shortly thereafter, paramedics responded to the scene and, finding a faint pulse, transported him to the hospital.  During transport, the victim went into cardiac arrest, and medics performed cardiopulmonary resuscitation on him.  He was pronounced dead shortly after arriving at the emergency room.

Later that day, at approximately 4 P.M., Sergeant Thomas J. Teahan of the Boston police department heard a radio broadcast to be on the lookout for the defendant in a white van in the Roxbury area.  Teahan, who was driving in Roxbury at the time, came across a van parked alongside the road that matched the description of the defendant's vehicle.  He called for backup, parked his vehicle to block the van, and approached the driver's side door on foot.  Teahan observed the defendant apparently asleep in the driver's seat with a cellular telephone at his

ear; he removed the defendant from the van and conducted a pat frisk to locate weapons. When Teahan asked the defendant if he was carrying a firearm, he replied, "No, I threw it in the Charles River." The defendant was then placed under arrest, handcuffed, and transported to the Boston police department station in Roxbury for initial booking (Roxbury booking). At the station, Teahan read the defendant the Miranda rights and informed him that he was under arrest for murder. During the booking, the defendant made several unsolicited statements to Teahan.

Thereafter, State police Trooper Erik Gagnon and two Cambridge police officers transported the defendant to the Cambridge police department for further booking (Cambridge booking). Gagnon detected the odor of alcohol on the defendant's breath, as well as slurred speech and a slightly unsteady gait while the defendant was walking, although he was not slipping, falling, or stumbling. During the twenty-five minute ride to Cambridge, the officers did not ask the defendant any questions. Nevertheless, the defendant made several unsolicited statements about the events that had transpired earlier in the day. At around 5:15 P.M., the defendant arrived at the Cambridge police department where he was booked, his clothing was taken, and he was placed in a cell. Thereafter, Gagnon and his colleagues decided that because the defendant

appeared "somewhat impaired," they would wait until the following morning to interview him. The next morning, at approximately 6:30 $\underline{A}$.$\underline{M}$., Gagnon and Detective Daniel McNeill of the Cambridge police department interviewed the defendant.

At trial, the defendant did not dispute that he shot and killed the victim. He did not testify but presented evidence to show that, because of a mental impairment, he lacked the capacity to commit murder in the first degree at the time of the killing. In particular, the defendant introduced the testimony of Dr. Robert Joss, a certified forensic psychologist, who opined that at the time of the killing the defendant had an Axis II personality disorder, not otherwise specified, with obsessive compulsive, schizoid, and paranoid features. Joss characterized the defendant as having a "substantial disorder of perception, particularly the perception of the sort of social interactions that grossly impaired his judgment." Therefore, whether the defendant actually was threatened or intimidated by the victim on the day of the killing was immaterial because the defendant was "predisposed to perceive [the victim] as threatening." Overall, Joss concluded that at the time of the killing, the defendant had a diminished capacity to form the intent necessary to premeditate deliberately or to act with extreme atrocity or cruelty, as well as more generally the intent necessary for malice.

In rebuttal, the Commonwealth called Dr. Alison Fife, a psychiatrist, who testified to her opinion that at the time of the killing, the defendant was not suffering from any mental illness, mental defect, or personality disorder, and had the capacity to appreciate the wrongfulness of his acts.

2. <u>Motion to suppress</u>. Before trial, the defendant moved to suppress statements he made after his arrest on January 28, 2009, on the ground that they were involuntary due to his intoxication; he also argued that the statements made during his interview with police on January 29 were obtained in violation of his Miranda rights, see <u>Miranda</u> v. <u>Arizona</u>, 384 U.S. 436 (1966), and his constitutional right against self-incrimination.[3] After an evidentiary hearing, the motion judge, who was the trial judge, denied the motion. The defendant argues that the denial constituted error.

a. <u>Standard of review</u>. "In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact

_____

[3] The defendant argued as well that his right to a prompt arraignment under <u>Commonwealth</u> v. <u>Rosario</u>, 422 Mass. 48 (1996), was violated because the police initially failed to advise him of this right and later obtained a waiver by "trickery." The motion judge rejected the argument, reasoning that there was no <u>Rosario</u> violation because its safe harbor window did not begin to run until the defendant became sober and, in any event, the defendant executed a valid waiver of his <u>Rosario</u> rights. See <u>Rosario</u>, <u>supra</u> at 56-57. The defendant does not challenge the judge's ruling on appeal. We agree with the judge's analysis, and do not consider the issue further.

absent clear error 'but conduct an independent review of [her] ultimate findings and conclusions of law.'" Commonwealth v. Scott, 440 Mass. 642, 646 (2004), quoting Commonwealth v. Jimenez, 438 Mass. 213, 218 (2002). We "make an independent determination of the correctness of the judge's application of constitutional principles to the facts as found." Id., quoting Commonwealth v. Mercado, 422 Mass. 367, 369 (1996). Here, in addition to testimony, the motion judge considered videotape evidence of the defendant's Cambridge booking on January 28 and of his interview with police on January 29. Thus, "to the extent that the judge based [her] legal conclusions on facts found by virtue of a video recording, 'we are in the same position as the judge in viewing the videotape,'" and independently review it without deference to the motion judge.[4] Commonwealth v. Clarke, 461 Mass. 336, 341 (2012), quoting Commonwealth v. Prater, 420 Mass. 569, 578 n.7 (1995).

b. January 28, 2009, statements. The defendant does not dispute that the statements he made at the time of his arrest, transport, and the Roxbury booking were spontaneous and not

---

[4] However, to the extent that the motion judge relied on testimony and videotape evidence to make credibility determinations relevant to her subsidiary findings of fact, we "adhere to the normal standard of review . . . [and] afford such findings substantial deference, and accept them unless not warranted by the evidence" (citations and quotations omitted). Commonwealth v. Clarke, 461 Mass. 336, 341 (2012).

obtained through police questioning, and that therefore Miranda protections did not apply.[5]  See Commonwealth v. Diaz, 422 Mass. 269, 271 (1996).  His sole argument is that, because he was intoxicated, the Commonwealth did not meet its burden of proving beyond a reasonable doubt that his statements were voluntary.  "The test for voluntariness is 'whether, in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was overborne to the extent that the statement was not the result of a free and voluntary act.'"  Commonwealth v. Durand, 457 Mass. 574, 595-596 (2010), quoting Commonwealth v. Souza, 428 Mass. 478, 483-484 (1998).  Relevant factors "include whether promises or other inducements were made to the defendant by the police, as well as the defendant's age, education, and intelligence; experience with

---

[5] The defendant's unsolicited statements made on January 28, 2009, may be summarized as follows.  At the Roxbury booking, after learning from Sergeant Thomas J. Teahan that he would be charged with murder, the defendant stated:  "Oh, the individual transpired, huh?"; he further told Teahan, "I am not a bad guy. [The victim] is always fucking with me . . . [h]e's always grabbing me and slapping me like I'm a woman."  The defendant also said that the victim told him to "[p]ull your knife.  I'll knock you the fuck out," and that the defendant said that he "just went into a rage.  I know I should have known better.  He died, huh?  My life is pretty much over, don't you think?" Thereafter, the defendant was transported to Cambridge, and he made the following statements to Trooper Erik Gagnon during the twenty-five minute drive:  "I was fed up with the individual"; "My goose is cooked"; "If I thought this out better, I would have gotten a passport and made a run for it"; and "I know I'm going to jail, but can we drive around for a while and talk?"

the criminal justice system; and his physical and mental condition, including whether the defendant was under the influence of drugs or alcohol." Durand, supra at 596. The mere presence of one or more factors "is not always sufficient to render the statements involuntary." Commonwealth v. Selby, 420 Mass. 656, 664 (1995). Further, although "special care must be taken to assess the voluntariness of a defendant's statement where there is evidence that he was under the influence of alcohol or drugs, an 'otherwise voluntary act is not necessarily rendered involuntary simply because an individual has been drinking or using drugs.'" Commonwealth v. Brown, 462 Mass. 620, 627 (2012), quoting Commonwealth v. Silanskas, 433 Mass. 678, 685 (2001).

Considering these factors, the motion judge found the defendant's statements to be voluntary. There was no error. The defendant indisputably showed signs of intoxication.[6] However, as the motion judge found (and as the videotape of the Cambridge booking confirms), the defendant was not so intoxicated that he was stumbling or falling down -- he followed

---

[6] The officers who interacted with the defendant testified, and the motion judge credited their testimony, that they detected the odor of alcohol on the defendant and observed his slurred speech, unsteady walking, and glassy, bloodshot eyes at various points from his arrest at around 4 P.M. through his arrival at the Cambridge police department after 5 P.M. A review of the videotape of the Cambridge booking corroborates the testimony.

commands, answered questions, carried on conversations, and stood, walked, and removed his clothing without assistance. Further, during that booking, the defendant acknowledged that he had received the Miranda rights earlier and asked questions about his location, the charges against him, and what would happen to him next; all of this signifies that he was lucid, cognizant of his surroundings, and had some appreciation of the gravity of his situation.[7] We agree with the motion judge's conclusion, "put in different terms by her, that 'although the defendant may have been somewhat intoxicated when he spoke to the police, his mind was rational and his faculties were under control.'" Commonwealth v. Koney, 421 Mass. 295, 305 (1995), quoting Commonwealth v. Simmons, 417 Mass. 60, 65 (1994).

---

[7] See Commonwealth v. Brown, 462 Mass. 620, 627 (2012) (although defendant's speech was "sluggish" from influence of drugs, his statements were voluntary where "there [was] nothing to suggest that he was acting irrationally or was out of control, or that his denials were induced by psychological coercion"); Commonwealth v. Simmons, 417 Mass. 60, 65-66 (1994) (defendant's speech was slurred due to intoxication, but his statements were voluntary when police could understand him, he walked without difficulty, and appeared to understand situation); Commonwealth v. Liptak, 80 Mass. App. Ct. 76, 80-82 (2011) (although defendant was intoxicated, his statements were voluntary because he was alert, coherent, understood and answered questions asked of him, and spoke cogently). Contrast Commonwealth v. Hosey, 368 Mass. 571, 578-579 (1975) (defendant did not intelligently waive Miranda rights when his level of intoxication rendered him "extremely high," "extremely emotional," and "detached from reality").

c.  January 29, 2009, statements.  The defendant further argues that his motion to suppress was erroneously denied because, when police interviewed him on January 29, 2009, the officers obtained statements from him in violation of his rights under the Fifth and Fourteenth Amendments of the United States Constitution and art. 12 of the Massachusetts Declaration of Rights.

(i)  Initial Miranda warnings.  Finding the defendant awake and alert in his cell the morning after his arrest, Detective McNeill and Trooper Gagnon asked him if he would agree to be interviewed and, after obtaining consent, brought him to an interview room.  He was given coffee and a bagel, and his handcuffs were removed.  At the outset, McNeill, who conducted the majority of the interview, read the defendant the Miranda rights.  After the defendant indicated that he understood those rights, the following exchange occurred:

Detective McNeill:  "Having these [Miranda] rights in mind, do you wish to speak to us now?"

Defendant:  "Yeah, but -- yes, I'll speak to you but there's certain things that might be kind of like sensitive --"

McNeill:  "Okay."

Defendant:  "-- that may jeopardize me because my rights has been read and --"

McNeill:  "I understand that."

Defendant:  "And then say hey look [inaudible] the rest of [inaudible]."

McNeill: "Again, I'm going to ask you to initial right here. Right here where it says -- right here under your previous initials and sign right here on the line. Just sign your name right there."

The defendant then signed the Miranda waiver form and permitted the interview to be recorded.

The officers began by asking the defendant about his upbringing, family, education, and employment. After about fifteen minutes, McNeill stopped the interview and read the defendant a form explaining his right to prompt arraignment under Commonwealth v. Rosario, 422 Mass. 48, 56 (1996). The defendant signed a Rosario waiver form and agreed to continue speaking with the officers but also stated that he "would kind of deviate from the more sensitive matters."

On appeal, the defendant claims that his waivers of the right to remain silent in response to the administration of Miranda rights were conditional rather than unequivocal, and as a result, the officers were obligated to seek further clarification from him before proceeding with the interview. At least with respect to the defendant's initial Miranda waiver, we disagree.[8] The motion judge found that the defendant's words, "Yes, I'll speak with you," and his signature of the Miranda

---

[8] The defendant's second Miranda waiver occurred after he invoked his right to remain silent; we consider that invocation in the following section of this opinion.

waiver signified an unequivocal, knowing, voluntary, and intelligent waiver of his right to silence.[9] There was no error. The statement by the defendant that he may want to "deviate" from more "sensitive" matters merely indicated that he understood that he could invoke the right to remain silent, and might choose to do so, in the future. See Commonwealth v. Bradshaw, 385 Mass. 244, 265 (1982) ("defendant has not only the right to remain silent from the beginning but also a continuing right to cut off, at any time, any questioning that does take place"). Accordingly, the officers were not obligated to seek clarification, at the time of the defendant's waiver. See Clarke, 461 Mass. at 351-352.

(ii) Postwaiver statements. After waiving his Miranda rights, the defendant spoke openly with the officers for approximately forty-five minutes, answering all questions asked of him. As questioning progressed, the conversation became increasingly focused on the defendant's prior relationship with the victim and the moments leading up to the shooting. After

---

[9] This conclusion has a strong evidentiary basis in the record: the defendant was alert and showed no signs of intoxication during the interview, see Commonwealth v. Shipps, 399 Mass. 820, 826 (1987); he had received and acknowledged understanding his Miranda rights on four separate instances the prior day, see Commonwealth v. Williams, 456 Mass. 857, 864 (2010); and there is no evidence that the officers engaged in trickery, coercion, or intimidation to obtain this waiver. See Commonwealth v. Cruz, 373 Mass. 676, 688-689 (1977).

describing how the victim had approached him holding a hammer on the morning of the shooting, the defendant stated:

Defendant: "Then I went to [buy] the breakfast and stuff and then I came back. But I would like to stop at that point because it [be]comes more intricate now and who knows what's going to happen" (emphasis added).

McNeill: "Okay. But, you know, I just want to say it's happened."

Defendant: "Yeah."

McNeill: "There are witnesses and the employees."

Defendant: "Yeah. I think --"

McNeill: "You know people -- Mike, Derek, Jimmy."

Defendant: "Yeah, Mike, yeah."

McNeill: "I just want to --"

Defendant: "But I don't know if Jimmy saw anything."

McNeill: "Well, they did, right. But what did [the victim] say -- what just -- you just had enough of his tactic [inaudible] of bullying you?"

Defendant: "Yeah. A lot of intimidation, yeah."

The defendant contends that once he stated, "I would like to stop at that point," he invoked unequivocally his right to remain silent, and that, rather than honoring his request, McNeill began pressuring him by emphasizing that "it happened" and pointing out that there were witnesses to try to get him to talk about the incident. The motion judge acknowledged the defendant's statement that he "would like to stop," but

determined that at no point during the interview did the defendant "cho[o]se to cut off questioning."

A defendant who has waived his right to silence may subsequently invoke that right at any point during questioning. Bradshaw, 385 Mass. at 265. However, in the postwaiver context, a subsequent invocation of the right to remain silent must be clear and "unambiguous[]," see Clarke, 461 Mass. at 342, quoting Berghuis v. Thompkins, 560 U.S. 370, 381 (2010), such that "'a reasonable police officer in the circumstances would understand the statement' to be an invocation of the Miranda right." Id., quoting Davis v. United States, 512 U.S. 452, 459 (1994). See Commonwealth v. Robidoux, 450 Mass. 144, 161 (2007), quoting Commonwealth v. James, 427 Mass. 312, 314 (1988) (postwaiver invocation of right to silence requires that defendant show "expressed unwillingness to continue"). Whether the defendant has met this burden is a fact-specific determination to be made based on the totality of the circumstances. Commonwealth v. Almonte, 444 Mass. 511, 519, cert. denied, 546 U.S. 1040 (2005), overruled on another ground by Commonwealth v. Carlino, 449 Mass. 71 (2007).

The Commonwealth argues that the defendant's statement about wanting to stop "reflect[s] nothing more than the defendant's desire to deviate from questioning touching on the shooting itself." It is the case that "a suspect's

unwillingness to answer questions on a particular topic does not unambiguously indicate that the suspect is unwilling to continue speaking with police or obligate them to inquire whether the suspect would 'like to reassert his right to silence.'" Commonwealth v. Santos, 463 Mass. 273, 285 (2012), quoting Robidoux, 450 Mass. at 161 n.7.[10]  Cf. Commonwealth v. Sicari, 434 Mass. 732, 748-749 (2001), cert. denied, 534 U.S. 1142 (2002) (prolonged silence in response to police questions); Commonwealth v. Senior, 433 Mass. 453, 463 (2001) (silence). However, considering the totality of the circumstances here, we disagree with the Commonwealth that the defendant's statement is to be read so narrowly.  There is nothing in the language of the defendant's entire statement, "I would like to stop at that point, because it [be]comes more intricate now and who knows what's going to happen," that qualifies or limits it to a particular question.

A defendant's request to halt the questioning at a later point of an interview, or failure to answer one specific question, "must be interpreted in the context of his willingness to talk both immediately prior to and subsequent to" that point.

---

[10] In Commonwealth v. Robidoux, 450 Mass. 144, 160 (2007), we concluded that there was no postwaiver invocation by the defendant of his right to silence when he "simply declined to talk about certain subjects" by stating, "I will not talk about my family," or stared at the interrogating officers.

Senior, 433 Mass. at 463, quoting Commonwealth v. Pennellatore, 392 Mass. 382, 387 (1984). Here, although initially the defendant had indicated twice that he might want to avoid "sensitive" matters, in the period immediately prior to his statement about stopping, he had engaged in conversation with the officers and willingly answered every one of their questions without any qualification at all for approximately forty-five minutes; there was no indication that the defendant was "pick[ing] and choos[ing]" among which questions to answer.[11] See id. In this context, his statement, "I would like to stop at that point," indicated that he had reached the "sensitive" areas that he did not want to talk about, and, accordingly, no longer wanted to proceed with the interview, but as he said, wanted "to stop." In the circumstances, we conclude that in stating, "I [want] to stop at that point," the defendant invoked his right to silence.[12]

---

[11] As to the period immediately following the statement, the Commonwealth's claim that it casts doubt on the defendant's invocation because he resumed answering some questions after refusing to answer others mischaracterizes what happened. The defendant did not immediately resume speaking or even answering questions after indicating that he would like to "stop." Rather, in response to the next substantive question asked of him, he stated, "I don't want to answer that question." This was the first time in the interview that the defendant stated that he did not want to answer a question posed by the officers.

[12] "Each case turns, as it must, on the specific facts." Commonwealth v. Sicari, 434 Mass. 732, 748 (2001), cert. denied, 534 U.S. 1142 (2002). However, it is instructive to consider

We appreciate that an appellate court reviewing a police interview after the fact -- generally aided by a written transcript and, often, a videotape of the interview, both of which can be reviewed more than once -- is in a different position than the police officers who are conducting that interview and acting in the moment.[13]  Here, the testimony at the motion to suppress hearing reflected that at least one of the interrogating officers, Gagnon, and perhaps also the officers' supervisors who were observing the interview through a two-way mirror, had some question about whether the defendant's statement about wishing to "stop at that point" meant he was

_____

other cases, and the defendant's words about wanting to stop are more in line with the facts of cases in which an invocation was found than with those concluding the opposite.  Compare, e.g., Commonwealth v. Santana, 465 Mass. 270, 282 (2013) (postwaiver statement that defendant could not "say any more" was clear invocation, precluding any further interview of defendant for remainder of evening, although not permanently); and Commonwealth v. Santos, 463 Mass. 273, 285 (2012) (postwaiver statement that "I'm not going on with this conversation" was clear invocation), with Commonwealth v. Leahy, 445 Mass. 481, 488-489 (2005) (postwaiver statement -- "Not right now, in a minute.  I need to figure some things out" -- in response to question whether defendant wanted to talk, was not clear invocation).

[13] Nonetheless, we take the word "stop" to mean what it says.  A suspect's or defendant's use of the word "stop," or the phrase, "I would like to stop at that point," in this context should raise a red flag for an interrogating police officer -- a signal that it is necessary at the very least for the officer immediately to pause in order to reflect on what the defendant has just said, and to consider whether the defendant is seeking to invoke his right to remain silent.  As discussed in the text, that is not what happened here.

terminating the interview altogether or only expressing a wish not to talk specifically about the actual shooting incident.[14] See Santos, 463 Mass. at 286. Assuming this to be the case, the uncertainty would have permitted the officers to ask a direct question designed to clarify the defendant's intent. See id. ("The question . . . should be brief, worded only to elicit an affirmative or negative response concerning whether the suspect wants [to stop] and should not be designed to keep the suspect talking"). The officers here did not follow such a course, however. Rather, when the defendant stated he "would like to stop at that point," McNeill, who was questioning the defendant at the time, immediately pressed on with arguments for why the defendant should keep speaking about the shooting incident. It was only a bit later, following a series of questions by McNeill about the gun the defendant had used, that Gagnon abruptly announced a "two minute" break that actually lasted fifty-one minutes. During the break the defendant was brought to the restroom, but otherwise kept in the interview room alone,

---

[14] Gagnon testified at the hearing on the motion to suppress that the fifty-one minute break taken in the interview at his behest was taken in part because Gagnon did not "fully understand" what the defendant meant when the defendant said he wanted to stop (i.e., he did not understand whether the defendant meant to invoke his rights to remain silent and to counsel), and Gagnon wanted to "clarify" that point -- and to "regroup, to talk to our supervisors" who were watching the interview through a two-way mirror.

although he was given reading glasses and a drink. At some point before the break ended, Gagnon apparently returned to the room and asked the defendant in substance about whether he wanted to continue. According to Gagnon, this conversation, which was not audio recorded, lasted about three minutes, but there is no indication that Gagnon specifically sought clarification about the meaning of the defendant's earlier statement about wishing to stop, or that he referenced that earlier statement at all.[15]

In these circumstances -- where McNeill did not seek to clarify but sought to keep the defendant talking, where a break occurred before any effort at all was made to inquire about the defendant's wishes about speaking to the police, and where no reference ever was made to the defendant's statement about

---

[15] At the motion to suppress hearing, Gagnon testified to his memory of the substance of his conversation with the defendant about wanting to continue. After this unrecorded conversation, the audio-recorded interview resumed with both officers present, and the following exchange occurred:

McNeill: "Since the time we took a break, there's probably been about a half hour break or so. You told us you don't have a problem talking to us."

Defendant: "No."

McNeill: "Is that correct?"

Defendant: "Yes."

The defendant was then given a fresh set of Miranda warnings and signed a waiver form.

wanting to stop -- we conclude that the officers "exceeded the narrow scope that was permitted [to clarify], and intruded into the defendant's invocation of his right" to remain silent. See Santos, 463 Mass. at 287.

When a person in custody has exercised his right to cut off police questioning, this does not "create a per se proscription of indefinite duration upon any further questioning by any police officer on any subject[.]" Michigan v. Mosley, 423 U.S. 96, 102-103 (1975). Rather, once such a person invokes this right, we must inquire "whether the person's right to be free from interrogation, once exercised, was 'scrupulously honored' before questioning resumed." Commonwealth v. Atkins, 386 Mass. 593, 598 (1982), quoting Mosley, supra at 104. To do so, we consider factors such as whether "the police (1) had immediately ceased questioning; (2) resumed questioning 'only after the passage of a significant period of time and the provision of a fresh set of warnings'; and (3) limited the scope of the later interrogation 'to a crime that had not been a subject of the earlier interrogation'" (Mosley factors). Clarke, 461 Mass. at 344, quoting Mosley, supra at 106.

In this case, the first and third Mosley factors unmistakably favor the defendant. As to the first, when the defendant invoked his right to silence, the officers did not immediately cease questioning. Id. Instead, in an obvious

effort to "overcome the defendant's resistance to interrogation," Commonwealth v. Brant, 380 Mass. 876, 884-885, cert. denied, 449 U.S. 1004 (1980), McNeill immediately reminded the defendant that the crime already had happened and that there were numerous witnesses, and persisted in questioning the defendant about the gun he had used.  Although Gagnon called for a break shortly thereafter, by that point, McNeill had already pressured the defendant to talk and had obtained additional substantive statements from him.[16]  With respect to the third

_____

[16] The pressure on the defendant to answer questions about the shooting incident continued in force after the break.  At that time, the defendant was given a fresh set of Miranda warnings and signed a waiver.  Shortly thereafter, McNeill broached the topic of the shooting itself, stating, "[W]hat's happened happened.  We just need your side of the story on how and why so we can put closure to this ordeal."  The defendant then made a series of general inculpatory statements about the circumstances, and his feelings, in the moments leading up to the shooting.  Thereafter, the officers' questions focused on the shooting incident.  When asked how he and the victim had ended up in the chemical yard together the defendant stated: "Can I let this one go by, this question" and McNeill responded, "Absolutely."  The defendant then indicated that he was willing to talk from the point when he left the scene of the shooting, and the officers respected that request for about six minutes before McNeill resumed questioning the defendant about the shooting itself.  The defendant then stated -- at least four times -- that he did not want to answer or that he wanted to leave parts out, but McNeill persisted, telling the defendant that his answers would allow McNeill "closure and just to put an end to it" and to "learn from it and understand it."  After this exchange, the defendant again said that he would talk only about the period after the shooting.  The officers respected this directive for about four minutes before McNeill once more urged the defendant to describe the incident from his perspective.  At that point, the defendant spoke openly about the shooting, describing what had occurred in the chemical yard, how the

Mosley factor, the officers plainly did not limit the scope of the later interrogation "to a crime that had not been a subject of the earlier interrogation." Clarke, 461 Mass. at 344, quoting Mosley, 423 U.S. at 106. Here, there was no separate crime ever at issue.[17] Compare Mosley, supra at 105 (no violation when second interrogation focused on "a crime different in nature and in time and place of occurrence" from subject of first interrogation), with Commonwealth v. Taylor, 374 Mass. 426, 435 (1978) (when subsequent "questioning of the defendant was not restricted to an unrelated crime, the police had departed from the procedure approved in Mosley, and . . . the judge was warranted in finding the defendant's Miranda rights to have been violated").

Assessment of the second Mosley factor is less clear. The second factor looks at the passage of time between the individual's invocation of the right to remain silent and the resumption of police questioning. There is no bright line that

victim's "survival instincts kicked in," how the victim was trapped because the gate was locked, the number of shots fired, and how the defendant had fled the scene. The defendant also stated that, ever since an incident with the victim involving a forklift several months earlier, discussed infra, he brought his gun to work "every day" without anyone else knowing.

[17] Although the defendant ultimately was convicted of various firearms offenses in addition to murder in the first degree, those charges all stemmed from the same shooting; there is no evidence that the officers ever were investigating the defendant's involvement in a separate criminal episode.

divides what would be a permissible break from one that is too short to be acceptable.[18] Nonetheless, because there was no meaningful change in circumstances before and after the fifty-one minute break between the defendant's invocation and the officers' return to questioning -- the defendant remained in police custody, was returned to the same room, and did not reinitiate questioning on his own, and when questioning resumed the same officers continued with the interview on the same subject -- the fifty-one minutes likely did not constitute a "significant period of time" sufficient to honor the defendant's invocation of his right to silence, even with the administration of a fresh set of Miranda warnings.  See Commonwealth v. Callender, 81 Mass. App. Ct. 153, 158 n.5 (2012) (thirty-five-minute break between interrogations insufficient, particularly in light of officers' violation of other Mosely factors).

---

[18] Compare, e.g., Commonwealth v. Brant, 380 Mass. 876, 882-883, cert. denied, 449 U.S. 1004 (1980) (fourteen minutes between interrogations impermissible), with Commonwealth v. Woodbine, 461 Mass. 720, 729-730 (2012) (no violation seventeen hours after invocation); Commonwealth v. Rivera, 424 Mass. 266, 269 (1997) (no violation three and one-half hours after invocation, fresh Miranda warnings given, and defendant never questioned by booking officer in first interview); Commonwealth v. Santo, 375 Mass. 299, 304 (1978) (no violation where invocation was previous day, fresh Miranda warnings given, and second interview was in different city); Commonwealth v. Avellar, 70 Mass. App. Ct. 608, 616 (2007) (no violation two hours after invocation and fresh Miranda warnings given).

In sum, considering the totality of the circumstances, the officers did not "scrupulously honor" the defendant's invocation of his right to silence. The question is whether that error was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 24 (1967); Commonwealth v. Santos, 463 Mass. at 287. To make this determination, we consider factors such as

> "the importance of the evidence in the prosecution's case; the relationship between the evidence and the premise of the defense; who introduced the issue at trial; the frequency of the reference; whether the erroneously admitted evidence was merely cumulative of properly admitted evidence; the availability or effect of curative instructions; and the weight or quantum of evidence of guilt."

Commonwealth v. Tyree, 455 Mass. 676, 701 (2010), quoting Commonwealth v. Dagraca, 447 Mass. 546, 553 (2006).

The Commonwealth contends that any error in this case was harmless beyond a reasonable doubt because the erroneously admitted statements were largely cumulative of other evidence, and the evidence of the defendant's guilt was overwhelming. The defendant disagrees, arguing that the prejudicial impact of his image and words on the video was too strong to be considered harmless. The Commonwealth's points are not without merit: there is overlap between a good number of the defendant's statements after he invoked his right to end the interview and properly admitted evidence of statements he had volunteered to police the day before the interview, and the evidence of the

defendant's guilt was indeed extremely strong.  But for reasons we explain infra, we conclude that the erroneous admission of the defendant's postinvocation statement, when considered in combination with (1) the prosecutor's use in his closing argument of that statement and other improper aspects of the closing, and (2) errors in the judge's final instruction on mental impairment, was not harmless and reversal of the defendant's murder conviction is required.  Because the issue bears on our consideration of the closing argument and may arise at a new trial, we first consider the defendant's claims of error relating to the admission of prior bad act evidence.

3.  Prior bad acts.  The defendant argues that the prosecution improperly introduced prior bad act and character evidence for which the unfair prejudice substantially outweighed its probative value.  The Commonwealth counters that the evidence complained of was properly admitted because it "established a pattern of workplace violence and hostility towards co-workers," and therefore was relevant and admissible to show the defendant's capacity to form the intent required for conviction; and that because the defendant touched on these same topics in his interview with the police, he "opened the door" to most of the prior bad act evidence admitted at trial.

The general rule governing prior bad act evidence is well settled:

> "The prosecution may not introduce evidence that a
> defendant previously has misbehaved, indictably or not, for
> the purpose of showing his bad character or propensity to
> commit the crime charged, but such evidence may be
> admissible if relevant for some other purpose. . . .  Such
> evidence can be highly prejudicial to the defendant, and
> therefore must be excluded unless it comes within one of
> the permitted uses, such as to show a common scheme,
> pattern of operation, absence of accident or mistake,
> identity, intent, or motive [or state of mind]."
> (Citations omitted.)

Commonwealth v. Helfant, 398 Mass. 214, 224-225 (1986).  Accord

Commonwealth v. Sharpe, 454 Mass. 135, 143 (2009).

Additionally, to be admissible, a defendant's prior bad acts may

not be too remote in time.  (Citation omitted.)  Commonwealth v.

Butler, 445 Mass. 568, 574 (2005).  Here, the prior bad act and

character evidence the defendant complains of includes:  (1) a

previous incident between the defendant and the victim over a

forklift; (2) a previous incident between the defendant and

another Baystate employee, Miguel Carballido, over a forklift;

and (3) derogatory comments about Haitian women that the

defendant allegedly made in the victim's presence.  We consider

each separately.

(i)  Prior forklift incident with victim.  The Commonwealth

presented evidence of a confrontation between the defendant and

the victim over the use of a forklift at work that occurred in

November, 2008, approximately three months before the victim was

killed.  The evidence came in through the testimony of other

Baystate employees as well as from the portion of the

defendant's statement to police that was properly admitted at trial.[19] There was no error in the admission of this evidence. It tended to show the antagonistic character of the defendant's and the victim's relationship, was not too remote in time, and was probative of the defendant's motive, state of mind, and intent. See, e.g., Commonwealth v. Rosenthal, 432 Mass. 124, 126-128 (2000) (evidence of violent relationship between defendant and victim, including two black eyes sustained by victim, admissible to demonstrate motive, intent, and rebut defendant's claim of lack of criminal responsibility); Commonwealth v. Ashman, 430 Mass. 736, 741-742 (2000) (evidence of altercation between defendant and victim in month preceding murder properly admitted to show defendant's state of mind, intent, and relationship with victim). See generally Commonwealth v. Morgan, 460 Mass. 277, 289 (2011), quoting Robidoux, 450 Mass. at 158 ("Determinations of the relevance, probative value, and prejudice of such evidence are left to the sound discretion of the judge, whose decision to admit such evidence will be upheld absent clear error").

---

[19] Specifically, in his interview with police, the defendant described this series of events: when the defendant used the forklift, the victim, who claimed to be using it, approached the defendant, grabbed him, "jacked him up," and said, "I'll F -- you up" while threatening to "knock [the defendant] out." After this occurred, the defendant "got into a stinking rage" and backed his own vehicle into the victim's car.

(ii) <u>Prior forklift incident between defendant and Carballido</u>. The prosecutor elicited testimony from Baystate employee Miguel Carballido, who was Mexican, that for at least three years, the defendant, who was from Trinidad, would "always bother" him at work in various ways, including calling Carballido a racist and making comments about Mexicans. Carballido testified that in June, 2008, approximately six months before the killing, the defendant took a forklift that Carballido was using. On realizing that the defendant had done so, Carballido physically pulled the defendant from the forklift, and the defendant "pulled a knife" on Carballido. In response, Carballido picked up a stick and challenged the defendant; the defendant walked away, and the confrontation ended. The day after this incident, the defendant threatened to shoot and kill Carballido.

Throughout the defendant's statement to police, including the properly admitted portion, he portrayed himself as the victim of harassment and intimidation by both Carballido and the victim, and implied that they acted together to antagonize him. Admission of the forklift incident with Carballido served to rebut the defendant's assertions about the source of his hostile relationships with both men, thereby providing the jury with a complete picture of those relationships. See <u>Commonwealth</u> v. <u>McCowen</u>, 458 Mass. 461, 479 (2010) (defendant's cross-

examination of police officer "opened the door" for prior bad act evidence on redirect to rebut implications raised by defense counsel); Commonwealth v. Maimoni, 41 Mass. App. Ct. 321, 327-328 (1996) (prior bad acts admissible, in part, to rebut defendant's testimony). See also Commonwealth v. Young, 382 Mass. 448, 463 (1981) (prior bad act evidence admissible to show full picture of entire relationship between defendant and victim). Further, although it presents a close question, evidence of the defendant's state of mind toward another Baystate employee was arguably probative of his state of mind and intent toward the victim. Cf. Commonwealth v. Riley, 467 Mass. 799, 818 (2014) (defendant's abuse toward other children probative of his state of mind toward child who was victim of murder). As such, the trial judge did not abuse her discretion in admitting the Carballido evidence.

(iii) Defendant's comments about Haitian women. Baystate employee Shane Nixon testified that, in the summer of 2008, he and the victim were having a conversation about the women they were dating, both of whom were Haitian or of Haitian descent. The defendant interjected, "You'd pretty much be a fool to date a Haitian woman." Nixon also related that after that initial comment, the defendant purposely made additional negative remarks about Haitian women in the victim's presence and that these comments upset the victim. The comments illustrated a

facet of the defendant's relationship with the victim -- a proper nonpropensity purpose -- and we cannot say that the trial judge abused her discretion in admitting evidence of them.[20]  See Commonwealth v. Mendes, 441 Mass. 459, 464-465 (2004) (verbal fights between defendant and victim admissible to demonstrate defendant's hostile relationship with victim).  See also Commonwealth v. Thomas, 448 Mass. 180, 188 (2007); Commonwealth v. Robertson, 408 Mass. 747, 750-751 (1990).

4.  Prosecutor's closing argument.  The defendant complains that the prosecutor's closing argument prejudiced his trial and warrants reversing his convictions.  He specifically argues that the prosecutor:  (1) impermissibly commented on the defendant's invocation of his right to silence; (2) misused -- for character and propensity purposes -- the prior bad act evidence that had been admitted solely on the issues of motive, intent, and relationship between defendant and victim; and (3) affirmatively misrepresented certain evidence.  We agree that the closing was improper.[21]

---

[20] In connection with each instance of prior bad act evidence, the trial judge gave a thorough instruction to the jury about the limited purpose for which they could consider the evidence, and she repeated this limiting instruction in her final jury charge.

[21] The defendant did not object to the prosecutor's closing and therefore, the closing argument is subject to review under the substantial likelihood of a miscarriage of justice standard. Commonwealth v. Jenkins, 458 Mass. 791, 796 (2011).  To the

We summarize the critical portions of the prosecutor's closing. Near the beginning of his argument, the prosecutor told the jury that "this case started back in November of 2008" with the "forklift incident":

"[A]fter [the forklift incident,] . . . the gun's coming to work. . . . My gun, a loaded gun, it's coming with me because at some point sometime I'm going to use it. And this day, January 28th, was the time. Premeditation can be a matter of seconds, and the Court will tell you, or it can be longer. In this case you have both. He was thinking about taking out [the victim] since early November."

. . .

"[D]on't ever get in his face. Don't ever confront him like Miguel [Carballido] did[,] or he'll pull a knife on you."

The prosecutor then reprised the forklift incidents with the victim and Carballido as well as the defendant's comments to the two men as follows:

"He jumps on the forklift. He does it just to irritate people when they're using it. That's why he talked to [the victim] about, you shouldn't go out with Haitian women. That's why he called Miguel a Mexican. It's the world of Clyde Howard."

"Knife to Miguel; violent, rams the car in a stinking rage."

Shortly thereafter, the prosecutor discussed the defendant's January 29, 2009, statement to the police, saying,

---

extent that the defendant did not raise all of the errors contained in the prosecutor's closing argument, we consider them in the following discussion as part of our review pursuant to G. L. c. 278, § 33E.

"Defense counsel says, oh, he really can't remember the details.  Kind of having a bad day.  It's a . . . little fuzzy.  What did he tell the police?  I'll talk to you guys, but there are certain things I'm not going to talk about because they might incriminate me.  And the police say[], okay, whatever.  Those are your rights.  And he never wanted to go there.  He didn't want to talk about the gun.  He didn't want to talk about where it was.  He didn't want to talk about the shooting because it might incriminate him.  No kidding, Clyde.  He's a violent man."

Toward the end of the closing, the prosecutor turned to testimony from the defense expert Joss, using it to undercut the defendant's theory of diminished capacity.  The prosecutor stated:

"Defense counsel says there's only one Clyde Howard.  That's not what Dr. Joss said.  He agreed with me; there are two sides to him.  He wants to please his superiors, Roczynski, Najarian, McGaffigan.  He looks down to people he feels are inferior to Clyde Howard and makes derogatory comments towards them and is arrogant towards them.  That's what that fancy little test showed.[22]

"Do you know what else it showed? He has a history of intimidating his wife and his children -- intimidating.  That's the other side of Clyde Howard.  He's a mean man, he's an intimidating man, he's a violent man who took a life with no justification, no reason."

"He deserves no sympathy.  He didn't snap.  You don't snap when you bring a gun to work [f]or over two months loaded."

These excerpts from the closing reflect essentially two categories of impropriety:  (1) use of portions of the

---

[22] The "fancy little test" is a reference to the psychological testing performed by Joss as part of his examination of the defendant.

defendant's statements that were obtained in violation of his Miranda rights; and (2) propensity-based argument.

a. <u>Miranda rights</u>. The prosecutor referred to the defendant bringing a loaded gun to work for several months at the beginning and the end of the closing, and also referenced the defendant's unwillingness to discuss with the police either the shooting itself or the gun he used in the shooting. Each of these references was to the portion of the defendant's statement that followed his invocation of the Miranda-protected right to cut off questioning and remain silent -- the portion that should not have been admitted in evidence.

By including the two references to the defendant's decision to bring a loaded gun to work for months preceding the shooting, the prosecutor directly connected it to the defendant's capacity to form the necessary intent for deliberately premeditated murder. Moreover, by making these references at the beginning and close to the end of the argument the prosecutor created bookends that served to highlight the premeditation theme.[23] See

---

[23] It bears emphasis that although, as the Commonwealth contends, there was substantial, properly admitted evidence -- including the volunteered statements of the defendant to the police the day before his custodial interview -- that the defendant possessed a gun on the day of the killing, apart from the defendant's erroneously admitted statement, no evidence was before the jury that the defendant had been bringing the gun, loaded, to work every day for two or three months before the killing. See note 16, <u>supra</u>.

Tyree, 455 Mass. at 702-704 (prosecutor's use of unconstitutionally admitted evidence as organizing theme of closing rendered error harmful).

As for the comments about the defendant's desire not to answer questions about the gun or the actual shooting incident, by arguing, "He didn't want to talk about the shooting because it might incriminate him," the prosecutor in effect connected the defendant's invocation of his right to remain silent to the issue of his substantive guilt. Using the invocation of Miranda rights to comment on a defendant's substantive guilt is strictly prohibited. See Doyle v. Ohio, 426 U.S. 610, 619 (1976); Commonwealth v. Mahdi, 388 Mass. 679, 694 (1983), citing United States v. Hale, 422 U.S. 171, 175, 181 (1975). In addition, this section of the prosecutor's argument sought to emphasize the rational thought process of the defendant during the interview to undercut defense's theory that he suffered from diminished capacity at the time of the crime. Cf. Wainwright v. Greenfield, 474 U.S. 284, 295 (1986) (defendant's post-Miranda silence inadmissible to prove criminal responsibility); Madhi, supra at 694-695 (same).

b. Prior bad acts and propensity. As discussed, the trial judge did not abuse her discretion in admitting evidence of certain prior bad acts committed by the defendant. But, as the judge explained to the jury both when the evidence was admitted

and in her final charge, this evidence was only to be used for the limited purpose of evaluating the defendant's motive, intent, state of mind, or, in some instances, the nature of the relationship between the defendant and the victim -- not for assessing the defendant's character. See Part 3, supra. In his closing, the prosecutor repeatedly and quite blatantly ignored the judge's evidentiary limitation; the argument is laced with remarks describing the defendant as a "mean" and "violent man" likely to commit violent acts -- i.e., using the bad acts directly as propensity evidence and negative character evidence. This use is forbidden and prejudicial. See Helfant, 398 Mass. at 224-225. See also Commonwealth v. Anestal, 463 Mass. 655, 672 (2012) ("It is implicit in the general rule regarding the inadmissibility of prior bad acts evidence that admission of such evidence carries with it a high risk of prejudice to the defendant" [citation omitted]).

The prosecutor's attempt to paint the defendant in a negative light reached its nadir with the reference to the defendant's intimidation of his family -- a reference that also misrepresented the evidence at trial. The prosecutor asserted that the psychological testing performed by Joss showed the defendant had a history of intimidating his wife and children. Although Joss had stated at trial, in response to the prosecutor's question on cross-examination, that the defendant

had had, in the past, a history of being intimidating, there was no suggestion by Joss that this "history" of intimidation was revealed by a psychological test of the defendant.[24] More to the point, the prosecutor transformed Joss's reference to a past "history" into a current character trait of the defendant, summarizing: "Intimidating. That's the other side of Clyde Howard. He's a mean man, he's an intimidating man, he's a violent man who took a life with no justification, no reason."

In sum, the prosecutor's extensive use of propensity-based argument in his closing was improper. It remains to evaluate the impact of these improprieties and the prosecutor's erroneous use of portions of the defendant's statement in the argument. We do so in conducting our review of the entire case under G. L. c. 278, § 33E. See Part 6, infra.

5. Jury instructions. The defendant claims error in the judge's final charge on mental impairment, the voluntariness of the defendant's statement, and the inference of malice the jury were permitted to draw from the intentional use of a dangerous weapon.[25]

---

[24] That the defendant had a (past) history of "intimidating" his wife and children came from Joss's report; the specific quotation from the report that the prosecutor elicited during cross-examination was that, "[the defendant] did have a history from years back of being intimidating to his wife and children."

[25] The defendant's claim relating to the permissible inference of malice from intentional use of a dangerous weapon

a.  Mental impairment.  The judge instructed the jury on

mental impairment following her full instructions on the

elements of murder in the first degree committed with deliberate

premeditation and committed with extreme atrocity or cruelty.

The instruction is reproduced below.[26]

---

appears to be that the judge's repetition of this instruction immediately following each separate definition or explanation of a prong of malice, without any concomitant explanation that the mental impairment claimed by the defendant also could be considered in relation to each of the prongs, constituted error in the circumstances of this case.  See Commonwealth v. Miller, 457 Mass. 69, 72-76 (2010).  Given our conclusion that the judge's instruction on mental impairment, in itself, was erroneous, we need not decide this point.

[26] The judge stated:

"Now, when considering and determining whether the Commonwealth has proven beyond a reasonable doubt the elements in first degree murder by deliberate premeditation and/or first degree murder by extreme atrocity or cruelty, you may consider the following.  In determining whether the Commonwealth has proven beyond a reasonable doubt the defendant's intent to commit first degree murder by deliberate premeditation or by extreme atrocity or cruelty, you should consider all the credible evidence relevant to the defendant's intent, including any credible evidence of the defendant's mental impairment on the defendant.

    "In determining whether the Commonwealth has proven beyond a reasonable doubt the defendant's knowledge at the particular time, you should consider all the credible evidence relevant to the defendant's knowledge, including any credible evidence of the defendant's mental impairment on the defendant."

The judge repeated essentially the same mental impairment instruction at the end of her instruction on murder in the second degree.

The instruction in itself is confusing, given its suggestion that the Commonwealth was required to prove "intent to commit first degree murder by deliberate premeditation or by extreme atrocity or cruelty."  The Commonwealth does not have such a burden.  Rather, the Commonwealth's obligation is to prove "malice" -- a term that certainly focuses on intent, but each of its prongs has a meaning distinct from "intent to commit murder by deliberate premeditation" or "by extreme atrocity or cruelty."  But of greater significance, and similar to Commonwealth v. Gonzalez, ante 410, 421-422 (2014), insofar as the judge's explanation of mental impairment focused solely on intent (and associated knowledge), the instruction never explained that the jury might consider the defendant's mental impairment in weighing whether the defendant more generally committed the crime with extreme atrocity or cruelty, an instruction that was required in substance.[27]  See id.; Commonwealth v. Rutkowski, 459 Mass. 794, 798 (2011); Commonwealth v. Gould, 380 Mass. 672, 685-686 & n.16 (1980).  See also Model Jury Instructions on Homicide 62 (1999); id. at

---

[27] The judge similarly failed to explain to the jury that they could consider the defendant's mental impairment in determining whether the Commonwealth had proved the defendant: (1) acted with malice -- any one of the three prongs; and (2) deliberately premeditated the victim's killing -- i.e., whether he thought before acting, and whether his decision to kill was based on reflection for some period of time.  See Model Jury Instructions on Homicide 62 (1999; id. at 40-41, 46 (rev. 2013).  These omissions, too, constituted error.

49 (rev. 2013).[28]  Particularly where the defendant's entire

defense was based on his allegedly impaired mental state, the

omission of these instructions was error.[29]

    b.  Voluntariness.  Concerning the judge's instruction on

the voluntariness of the defendant's statements.  The judge

stated:

> "You may consider whether the statements, if any, made by
> [the defendant] were calculated to exculpate or mitigate
> his actions, such as an inference might be drawn that he
> knew his statements to the police could have adverse
> consequences, and therefore, you may draw an inference that
> he made the statements voluntarily.  Or you may not draw

---

[28] The 1999 version of the Model Jury Instructions on
Homicide (1999) reflects this point, and the 2013 version does
so even more clearly.  See Model Jury Instructions on Homicide
49 (rev. 2013) ("You may consider the defendant's mental
condition at the time of the killing, including any credible
evidence of mental impairment . . . in determining whether the
Commonwealth has proved beyond a reasonable doubt that the
defendant committed the killing with extreme atrocity or
cruelty"); Model Jury Instruction on Homicide 62 (1999) ("More
particularly, you may consider any credible evidence of the
defendant's mental impairment in determining . . . whether the
defendant acted in a cruel or atrocious manner in causing the
death of the deceased").  We urge trial judges to use these
instructions on mental impairment in their complete form.

[29] During the charge conference that the judge held the day
before instructing the jury, the defendant's counsel in
substance raised the points we have just discussed in objecting
to the Commonwealth's proposed instruction on mental impairment.
After the judge charged the jury, however, defense counsel
simply stated his objection "to not providing the mental
impairment instruction that I submitted."  Because we consider
the errors in the mental impairment instruction in combination
with other errors in conducting the review required by G. L.
c. 278, § 33E, see Part 6, infra, we need not decide whether the
defendant's objection to the mental impairment instruction was
preserved.

that inference and you may determine that that inference is not reasonable."

As the Commonwealth points out, there are cases that offer support for considering the fact that a defendant made an exculpatory statement in the course of a police interrogation in determining whether statements were voluntary. See, e.g., Commonwealth v. Davis, 403 Mass. 575, 581 (1988); Commonwealth v. Vasquez, 387 Mass. 96, 99-100 (1982). These cases, however, did not involve jury instructions but were reviews of denials of motions to suppress. In a case such as this, where a claim of mental impairment is made and is central to the case, there is a potential for misuse by a jury, that is, a risk that the exculpating nature of the defendant's words or statements will be used as evidence of his mental capacity. A jury instruction such as the one given is better left unsaid.

6. Review under G. L. c. 278, § 33E. "Our duty under G. L. c. 278, § 33E, is to consider broadly the whole case on the law and the facts to determine whether the verdict is 'consonant with justice.'" (Citation omitted.) Gould, 380 Mass. at 680.

We have discussed previously that the admission of the defendant's postinvocation statement constituted error, in violation of the defendant's constitutional right to remain silent; and that, because the defendant objected to the

statement's admission, the error must be shown to be harmless beyond a reasonable doubt.  Chapman v. California, 386 U.S. at 24; Santos, 463 Mass. at 287.  Although many of the defendant's postinvocation remarks were cumulative, evidence that the defendant had been carrying a gun to work every day for two to three months distinctly was not, and as described in Part 4, supra, this admission by the defendant became an important focal point of the prosecutor's closing argument.  Furthermore, the admission of the defendant's postinvocation statement placed before the jury the defendant's repeated requests to the officers not to answer questions about the shooting itself or to leave parts of the narrative out, and two instances of damning explanation as to why the defendant chose this path:  because it left him appearing "guilty" (Gagnon's word)[30] and as "the culprit" (the defendant's word).[31]  The jury obviously could view

---

[30] At about twelve minutes after the postinvocation portion of the interview began, the officers' questioning zeroed in on the actual shooting.  As indicated, see note 16, supra, when asked how he and the victim ended up in the chemical yard together, the defendant stated:  "Can I let this one go by, this question" and McNeill responded, "Absolutely."  The conversation resumed and shortly thereafter the defendant stated, "That's not what happened so I want to leave that part out."  Gagnon responded:  "So you want to cut a certain part out because that leaves you guilty, and you don't want to talk about that, and I have no problem with that . . . .  We'll skip that section, okay?  That's not a problem."  (Emphasis added.)

[31] Later than the point in the interview described in note 30, supra, Detective McNeill asked:

the defendant's reluctance to speak about the details of the
shooting as reflecting repeatedly his consciousness of guilt,
brought home even more clearly by the "guilty" and "culprit"
remarks, which was stressed by the prosecutor in his closing.

---

McNeill: "At this time, is there anything else you want to
share with us on the event because, again, it will allow us
closure on the events and -- because we've already had the
statements from the four employees. But again to hear your side
of the story and then how it got into the middle of the
warehouse and out to the [d]umpster, because there's still a
little gap there that we need to know and for my own self. It's
not going to affect anyone else, but it just gives me a closure
why -- . . . ."

Defendant: "That part is [inaudible]. Can I leave that
part out?"

McNeill: "Well, it's happened. If you want to leave it
out, leave it out, but it would allow me closure and just to put
an end to it, just to get it off your chest and say, hey, here
it is, this is what happened. It's over and done with."

Defendant: "I know, but that part I'd like to leave because
-- "

McNeill: "But you understand my point? So I can, you
know, learn from it and understand it."

Defendant: "Well, it's just that that point -- I mean,
that part I want to leave out because -- "

. . .

Gagnon: "Clyde, what is it? Is it the intimate details
that's bothering you, like you don't want to talk about the
intimate details here or like what -- let us know what's going
on in your head as far as this."

Defendant: "Well, there's certain details I would like
to leave out there because I'd have to -- I mean not to give the
other, but this particular part here it could be construed as
though I -- well, I'm the culprit" (emphasis added).

In addition, the specific details about the shooting incident and his own appreciation of the victim's state of mind (see note 16, supra), which the defendant finally supplied to the officers near the end of his statement, were chilling and could certainly be understood by the jury as evidence of deliberate premeditation as well as extreme atrocity or cruelty. The potential for prejudice to the defendant arising from the admission of the statement -- both in itself and then as used by the prosecutor in the closing -- is obvious.

The defendant was convicted of murder in the first degree committed with deliberate premeditation and also committed with extreme atrocity or cruelty. Although the evidence of the defendant's guilt under both theories was very strong, with respect to deliberately premeditated murder, we cannot say that the erroneous admission of the defendant's postinvocation statement, and its use by the prosecutor in his closing, was harmless beyond a reasonable doubt.[32] See Commonwealth v.

---

[32] As for the closing argument, the defendant did not object to it, despite his objection to various portions of evidence that became the basis for errors in the prosecutor's closing. It also is true that the prosecutor's argument contained substantial sections that were entirely proper. Nevertheless, "[t]his is not a case in which a fleeting, isolated, improper statement in an otherwise proper argument could, in the context of the entire closing argument, be deemed nonprejudicial." Commonwealth v. Lewis, 465 Mass. 119, 132 (2013). The prosecutor's comments -- those concerning the erroneously admitted postinvocation evidence and the improper propensity statements that in part found their source in the postinvocation

Perrot, 407 Mass. 539, 549 (1990) (in determining whether error was harmless beyond reasonable doubt, "[t]he essential question is whether the error had, or might have had, an effect on the jury and whether the error contributed to or might have contributed to the verdicts").

Turning to murder committed with extreme atrocity or cruelty, we similarly conclude that a combination of errors created sufficient harm to require reversal on that theory. As discussed, a number of the defendant's postinvocation statements that were admitted in error provided support for the jury to find extreme atrocity or cruelty, as did the propensity-based descriptions of the defendant in the prosecutor's closing argument. It is true that in contrast to deliberate premeditation, the prosecutor did not use postinvocation evidence in his closing explicitly to build the case for a finding of extreme atrocity or cruelty. At the same time, however, the errors in the judge's instruction on mental impairment had a particularly prejudicial effect. In relation

evidence -- permeated the closing, and as earlier discussed, the prosecutor's erroneous bookend references to the postinvocation evidence that the defendant was carrying a gun for several months before the killing focused explicitly on the defendant's capacity to deliberately premeditate -- an issue at the heart of the defense:  the defendant's argument to the jury at the end of the case was that he was guilty of murder in the second degree, not first.  Further, although the judge explained to the jury that closing arguments were not evidence, her charge did not contain any targeted instructions designed specifically to mitigate the effect of the argument errors.  See id. at 131.

to extreme atrocity or cruelty, the judge's mental impairment instruction, which focused solely on intent and knowledge, missed the mark: "Intent and knowledge are not aspects of extreme atrocity or cruelty." Rutkowski, 459 Mass. at 797-798.[33] Rather, as was true in that case, "[i]t should have been made clear to the jury that they could consider evidence of mental impairment on the specific question whether the murder was committed with extreme atrocity or cruelty." Id. at 798. "A jury could have found the defendant's act intentional, yet not extremely atrocious or cruel, due to the defendant's [mental impairment]. . . . [T]he jury should reflect the community's conscience in determining what constitutes an extremely cruel or atrocious killing." Commonwealth v. McDermott, 393 Mass. 451, 458 (1984). See Gould, 380 Mass. at 685-686. See also Gonzalez, ante at 422-423.

7. Conclusion. The defendant's conviction of murder in the first degree on the theories of extreme atrocity or cruelty and deliberate premeditation is vacated. The Commonwealth has

---

[33] The potential for prejudice arising from the concentration on intent and knowledge of an instruction on mental impairment appears to be less in relation to the theory of deliberate premeditation. In contrast to extreme atrocity or cruelty, intent is an aspect of deliberate premeditation, which requires the Commonwealth to prove both an intent to kill as well as at least some intentional reflection on the part of the defendant. See Commonwealth v. McMahon, 443 Mass. 409, 418 (2005). See also Model Jury Instructions on Homicide 39-40 (rev. 2013).

the option of either retrying the defendant on the murder indictment or accepting a reduction of the verdict to murder in the second degree, which was the verdict urged by the defendant at his first trial.[34]  See Gonzalez, ante 424; Commonwealth v. Thomas, ante 531, 532 (2014).  See also Commonwealth v. Bell, 460 Mass. 294, 310 (2011).  The Commonwealth shall inform this court within fourteen days of the date this opinion issues whether it will retry the defendant for murder in the first degree or move to have the defendant sentenced to murder in the second degree.  After the Commonwealth so informs us, we will issue an appropriate rescript to the Superior Court.

So ordered.

---

[34] Throughout this case, the defendant consistently has admitted that he killed the victim.  In his opening statement to the jury, the defendant's counsel appeared to suggest that the jury should find the defendant guilty of manslaughter, and counsel later requested a manslaughter instruction as part of the final charge to the jury.  The judge denied the request, however, because she found it lacking support in the evidence.  The defendant does not press the point on appeal, and review of the trial evidence leads us to agree with the judge's conclusion.