COMMONWEALTH *VS.* BRANDON CALLENDER.

No. 10-P-1385.

Bristol. September 14, 2011. - January 23, 2012.

Present: GRASSO, KATZMANN, & RUBIN, JJ.

*Practice, Criminal,* Motion to suppress, Admissions and confessions. *Constitutional Law,* Admissions and confessions. *Evidence,* Admissions and confessions.

A trial court judge did not err in granting a criminal defendant's motion to suppress statements that he made during a police interrogation, where, considering the totality of the circumstances surrounding the defendant's interrogation, this court could not say that the police scrupulously honored the defendant's invocation of his right to remain silent. [157-161]

INDICTMENTS found and returned in the Superior Court Department on May 9, 2008.

A pretrial motion to suppress evidence was heard by *Robert J. Kane,* J.

An application for leave to prosecute an interlocutory appeal was allowed by *Robert J. Cordy,* J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him to the Appeals Court.

*Steven E. Gagne,* Assistant District Attorney (*Garrett R. Fregault,* Assistant District Attorney, with him) for the Commonwealth.

*John D. Moses* for the defendant.

KATZMANN, J. The defendant, Brandon Callender, brought a motion to suppress statements he made during a police interrogation, arguing that the police did not scrupulously honor his invocation of his right to remain silent, in violation of the Fifth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. After a four-day suppression hearing, during which the motion judge reviewed a video

recording of the interrogation and heard testimony from five police officers, the judge granted the defendant's motion to suppress. The Commonwealth filed this interlocutory appeal, arguing that the judge erred as a matter of law. Governed by *Michigan* v. *Mosley*, 423 U.S. 96 (1975), we affirm.

*Background.* "In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of his ultimate findings and conclusions of law.' *Commonwealth* v. *Jimenez*, 438 Mass. 213, 218 (2002). The judge determines the weight and credibility of the testimony. . . . '[O]ur duty is to make an independent determination of the correctness of the judge's application of constitutional principles to the facts as found.' *Commonwealth* v. *Mercado*, 422 Mass. 367, 369 (1996)." *Commonwealth* v. *Scott*, 440 Mass. 642, 646 (2004).[1]

Here, the motion judge issued a detailed memorandum setting forth his findings and conclusions of law. He found that on April 4, 2008, Joshua Fitzgerald and his brothers allegedly were involved in a brawl with the defendant and others in which Fitzgerald was wounded by knife, resulting in his death. In connection with the police investigation of the incident, the defendant was arrested pursuant to a warrant on April 7, 2008.[2] He was brought to the booking room of the Fairhaven police station

---

[1]The Commonwealth argues that this court should give deference to findings of fact based on testimony at the evidentiary hearing but need not defer to findings of fact based on the judge's review of the interrogation video recording (video). This bifurcated approach is not feasible where the motion judge's findings of fact were "[b]ased on a review of the credibility of the aggregated evidence"; there is no delineation that certain findings of fact were based only on the video; and witnesses testified about excerpts from the video. Contrast *Commonwealth* v. *Novo*, 442 Mass. 262, 266 & n.3 (2004) (interrogation-related findings not deferred to where "based almost exclusively" on videotaped confession, "testimony focused primarily on events leading up to the videotape recorded interview," and police witness "explicitly deferred to the videotape"); *Commonwealth* v. *Durand*, 457 Mass. 574, 596 (2010) (findings "based almost exclusively" on interrogation videotape not accorded deference).

In any event, we have viewed the video recording and note that the judge's factual findings are consistent with what the recording shows.

[2]The defendant was indicted on May 9, 2008, on charges of murder in violation of G. L. c. 265, § 1; armed assault with intent to murder in violation of G. L. c. 265, § 18(*b*); and assault and battery by means of a dangerous weapon in violation of G. L. c. 265, § 15A(*b*).

and was advised at the outset (at 12:42 P.M.) by Detective Glen Cudmore of his rights under *Miranda* v. *Arizona*, 384 U.S. 436 (1966). The defendant told Cudmore that he did not want to speak to him, invoking his right to silence at 12:44 P.M. With the exception of a few basic booking questions, Cudmore did not ask the defendant any more questions.

Approximately one-half hour later, State police Trooper Robert Lima and Fairhaven police Detective Jerald Bettencourt entered the room. As the motion judge found:

> "At approximately 1:16 [P.M.], Lima and Bettencourt entered the booking room and immediately spoke with Cudmore. Cudmore advised the officers that Callender had been 'Mirandized' and 'said he didn't want to speak.' Cudmore added 'I asked him if he wanted to talk to me and he said no. That's all he said.'[3]

> "At approximately 1:16 [P.M.], Lima and Bettencourt approached Callender, who was chained to the bench. After Lima and Bettencourt introduced themselves, Lima asked Callender 'Do you want to talk for a few minutes?' Callender, unfamiliar with either officer, softly replied '[s]ure, I don't care.' Callender's response to Lima's inquiry may be characterized as apathetic. Lima now encouraged Callender to talk, stating 'Yeah, just get it off your chest and we can talk about why you are here and all that. Okay, good to go?'

> "The officers now spoke about where the interview would occur. Bettencourt suggested to Lima the interview take place in the booking room, 'unless you want to get into a comfortable setting.' Lima agreed that chairs be brought into the booking room and that the interview be conducted in that location in which Callender was seated on a bench with his left hand chained to the bench.

> "After Callender had agreed to be interviewed, Lima asked Callender whether he wished to have 'a cup of water.' Another officer volunteered to bring the beverage and Cal-

---

[3]The motion judge "ma[de] no finding or any conclusion (inference) that Callender overheard the conversation" between the three officers.

lender agreed to the officer's suggestion of a Pepsi instead of water.

"At this time, neither Lima, Bettencourt nor any other officer had administered a fresh set of Miranda warnings to Callender. Nonetheless, Callender was now questioned by Lima with Lima labeling the inquiries 'admin things.' Callender, who had just provided Cudmore with answers to booking questions was now questioned by Lima about his name and residence. After Callender got into the rhythm of answering Lima's questions, Bettencourt mentioned his belief that Callender had already been notified of his Miranda rights. Condensing the Miranda rights to 'the right to remain silent,' Bettencourt stated that he would 'read it off this paper here' and instructed Callender that you 'just have [to] sign it that I gave them to you. And we will talk . . . .' Without ever having heard a fresh recitation of his Miranda rights, Callender responded 'I'm left handed'; Bettencourt replied 'that is not a problem,' presumably referring to Callender's left hand being chained to the bench.

"After this exchange, Lima against [sic] offered Callender a beverage with Callender responding '[n]o, I'm all right' and Lima then making sure saying '[y]ou're all right with soda?'

"Bettencourt now rapidly but correctly recited the original Miranda warnings to Callender followed by the inquiry '[d]o you understand these rights as I read them to you.' Callender responded '[y]a.' Bettencourt informed Callender that he 'c[ould] decide at any time to exercise these rights and not answer any questions or make any statements.' In response to Bettencourt's question, 'ok,' Callender acknowledged his understanding.

"Callender's left hand was released in order for him to sign the document. Before Callender signed the Miranda rights document indicating his understanding of his rights, he was never given an adequate opportunity to read the Miranda rights or his waiver of the rights."

The officers then questioned the defendant about events relat-

ing to the Fitzgerald homicide. The questioning lasted more than three hours. During the interview the defendant made inculpatory statements. The motion judge suppressed his statements and the fruits thereof, concluding that the Commonwealth had failed to carry its burden of demonstrating that the police scrupulously honored Callender's initial exercise of his right to remain silent.

*Discussion.* In *Michigan* v. *Mosley*, 423 U.S. 96, 102-103 (1975), the United States Supreme Court held that the "*Miranda* opinion can[not] sensibly be read to create a *per se* proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent." See generally Smith, Criminal Practice & Procedure § 6.43 (3d ed. 2007). When a suspect invokes his or her right to remain silent under *Miranda* v. *Arizona*, 384 U.S. at 444, and is subsequently re-approached for interrogation, the inquiry is "whether the person's right to be free from interrogation, once exercised, was 'scrupulously honored' before questioning resumed." *Commonwealth* v. *Atkins*, 386 Mass. 593, 598 (1982), quoting from *Mosley*, 423 U.S. at 104. See *Commonwealth* v. *Clarke*, 461 Mass. 336, 343 (2012). See generally Grasso & McEvoy, Suppression Matters Under Massachusetts Law § 18-5[b][1] (2011-2012 ed.). Among the factors relevant to this analysis, the *Mosley* Court identified (1) whether a significant amount of time elapsed between the suspect's invocation of the right to remain silent and further questioning; (2) whether the same officer conducted both the interrogation where the suspect invoked the right and the subsequent interrogation, and whether the venues differed; (3) whether the suspect was given a fresh set of Miranda warnings before the subsequent interrogation; (4) whether the subsequent interrogation concerned the same crime as the interrogation previously cut off by the suspect; and (5) the persistence of the police in wearing down the suspect's resistance in order to change his mind. *Mosley*, 423 U.S. at 105-106. See *United States* v. *Hsu*, 852 F.2d 407, 410-412 (9th Cir. 1988); *United States* v. *Lugo Guerrero*, 524 F.3d 5, 12 (1st Cir. 2008). See also *Commonwealth* v. *Taylor*, 374 Mass. 426, 433 (1978); *Commonwealth* v. *Rivera*, 424 Mass. 266, 269 (1997), cert.

denied, 525 U.S. 934 (1998); *Clarke*, 461 Mass. at 344. No one factor is determinative in the analysis, nor should *Mosley* be understood as setting forth an exhaustive set of criteria. See *Hsu*, 852 F.2d at 411. "Unlike the clearcut, purely objective test in *Miranda* — did the police officers fully inform the suspect of his rights before he confessed? — the inquiry in *Mosley* involves a multiple factor review." *United States* v. *Barone*, 968 F.2d 1378, 1383 (1st Cir. 1992). In that latter analysis, courts look to the totality of the circumstances. See *Rivera*, 424 Mass. at 269; *Lugo Guerrero*, 524 F.3d at 12.

We turn initially to the application of the *Mosley* factors. Under the first *Mosley* prong, the motion judge found that approximately thirty-five minutes[4] elapsed between the defendant invoking his right to remain silent to Cudmore and Lima asking him whether he wished to talk. Although in *Mosley*, 423 U.S. at 106, the Court determined that two hours constituted a "significant period of time," it did not suggest any durational minimum. Massachusetts courts have concluded that the defendant's Miranda rights were not scrupulously honored where, in addition to the violation of other *Mosley* factors, the interval was thirty minutes or less. See *Taylor*, 374 Mass. at 434 (five minutes); *Commonwealth* v. *Jackson*, 377 Mass. 319, 326 (1979) (thirty minutes); *Commonwealth* v. *Gallant*, 381 Mass. 465, 468 (1980) (one minute). See also *Commonwealth* v. *Brant*, 380 Mass. 876, 882-883, cert. denied, 449 U.S. 1004 (1980) (fourteen minutes). Contrast *Rivera*, 424 Mass. at 269 (no *Mosley* violation where interval was three and one-half hours); *Commonwealth* v. *Avellar*, 70 Mass. App. Ct. 608, 616 (2007) (suppression not required where interval was approximately two hours).[5]

---

[4]The Commonwealth contends that only thirty-two minutes passed but concedes that this difference is not determinative.

[5]The Commonwealth cites the thirty-minute time interval in *Hsu*, 852 F.2d at 411, to support its argument that the thirty-five-minute gap between interrogations in this case does not violate *Mosley*. In *Hsu*, the court concluded that an interval of thirty minutes "might ordinarily incline us toward a conclusion that right to cut off questioning was not respected" but held that the defendant's rights were otherwise scrupulously honored, which mitigated against determining that a *Mosley* violation occurred. *Hsu*, 852 F.2d at 412. This case is distinguishable from *Hsu* because here the officers did not otherwise scrupulously honor the defendant's rights.

The second *Mosley* factor, focusing on who conducted the subsequent interrogation and its venue, inclines here in part toward the Commonwealth, and in part toward the defendant. In *Mosley*, the defendant's " 'right to cut off questioning' was fully respected" where, among other factors, Mosley was questioned by a different police officer when the interrogation resumed. *Mosley*, 423 U.S. at 104, quoting from *Miranda*, 384 U.S. at 474. See *Rivera*, 424 Mass. at 269 (no *Mosley* violation where booking officer, who did not question defendant, was different from officers performing subsequent interrogation). Here, the defendant invoked his right to remain silent before Cudmore, whereas Lima and Bettencourt conducted the subsequent interrogation. On the other hand, in contrast to *Mosley* where the two interrogations were conducted in different venues, 423 U.S. at 104, here the subsequent interrogation took place in the same booking room where the defendant had invoked his right to remain silent and where the defendant remained handcuffed to a bench throughout the booking and the subsequent interrogation. Contrast *Lugo Guerrero*, 524 F.3d at 12 (subsequent interrogation at different location).

Under the third *Mosley* prong, we next consider whether fresh Miranda warnings were given before the subsequent interrogation. In this case, upon entering the booking room to initiate the subsequent interrogation, the officers did a number of things before reading the defendant the Miranda rights again. Lima and Bettencourt approached the defendant, and Lima asked him if he wanted to "talk for a few minutes," to which the defendant replied, "[S]ure, I don't care." Lima encouraged the defendant to "get it off [his] chest." The officers spoke about where the interview would occur. The officers offered the defendant a beverage. Lima next asked the defendant questions about "admin things" such as his name and address. The Commonwealth argues that *Mosley* only requires police to reiterate the Miranda warnings to a suspect prior to interrogation, and that the police complied with that requirement here because nothing prior to the fresh Miranda warnings amounted to "interrogation." What the Commonwealth ignores, however, is that in *Mosley*, in noting that the defendant "was given full and complete *Miranda* warnings at the outset of the second interrogation," 423 U.S. at 104, the Court

determined that the defendant "was thus reminded again that he could remain silent and could consult with a lawyer, and was carefully given a full and fair opportunity to exercise these options." *Id.* at 104-105. Here, however, as the motion judge found, the officers "reversed the sequence of the administration of Miranda rights. Instead of reciting a fresh set of warnings and then securing a defendant's knowing waiver, Lima bypassed the procedure of providing a fresh set of warnings, by directly asking [the defendant] if he wished to speak." By first getting the defendant in the rhythm of answering questions before providing the fresh Miranda warnings, the officers undermined the spirit of *Mosley.* See *Jackson,* 377 Mass. at 326 ("We think the police conduct here was contrary to the letter and the spirit of the *Miranda* decision"). Moreover, we agree with the motion judge that the manner in which the officers delivered the fresh Miranda warnings created the impression that the defendant had already waived his Miranda rights, further burdening the defendant's exercise of those rights.

The fourth *Mosley* factor considers whether the subsequent interrogation concerns the same subject as the initial effort to question the defendant. Here, Cudmore, in the initial encounter with the defendant, did not question the defendant about the homicide that he was suspected of committing and which was the subject of the subsequent interrogation. However, no one has argued or suggested, and the record does not support, that the defendant was charged with any other crime or that he would have any reason to believe that he was invoking his Miranda rights with regard to one charge but later being questioned with regard to another charge. Here the officers' questioning was focused on the homicide in connection with which the defendant had just been arrested and had, only thirty-five minutes before, invoked his right to silence. This factor weighs against the Commonwealth. See *Taylor,* 374 Mass. at 435 ("[W]here the questioning of the defendant was not restricted to an unrelated crime, the police had departed from the procedure approved in *Mosley*").

The fifth *Mosley* factor, focusing on the zealousness of the police in reinitiating questioning, inclines toward the defendant. Here, the officers knew of the defendant's Miranda invocation

before they attempted to speak with him. Yet, as has been noted, they not only resumed questioning, but did so in a manner that was not respectful of his prior invocation. Compare *Jackson*, 377 Mass. at 326 ("[T]he statements made to [the defendant] by the police officer were . . . designed to undermine [his] decision to remain silent and to persuade him to confess").

In *Mosley*, the Court observed that "[t]hrough the exercise of his option to terminate questioning [a suspect] can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting." 423 U.S. at 103-104. Here, upon consideration of the totality of the circumstances, we cannot say that the defendant's right to cut off questioning, once invoked, was "scrupulously honored."[6] The order allowing the defendant's motion to suppress is affirmed.[7]

*So ordered.*

---

[6]In this regard, we further note that the motion judge found that the police did not comply with G. L. c. 276, § 33A, requiring notification, promptly upon arrival at the police station, of an arrested individual's right to use a telephone, such use to be permitted within one hour after arrival.

[7]Having determined that the police did not scrupulously honor the defendant's invocation of his Miranda rights as required by the Supreme Court in *Mosley*, we need not consider whether the Commonwealth carried its burden of showing beyond a reasonable doubt, as is required by our unique Massachusetts practice, that the defendant subsequently waived his Miranda rights. See *Commonwealth* v. *Day*, 387 Mass. 915, 920-921 (1983).