SUPERIOR COURT 
 
 COMMONWEALTH vs. WORLKENS METELLUS

 
 Docket:
 2184CR00261
 
 
 Dates:
 February 14, 2024
 
 
 Present:
 William F. Bloomer Justice of the Superior Court
 
 
 County:
 SUFFOLK
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS CUSTODIAL STATEMENTS ATTRIBUTED TO DEFENDANT (Paper No. 78)
 
 

             The defendant, Worlkens Metellus ("Metellus"), is charged with, among other things, assault with intent to murder and assault and battery by means of a dangerous weapon resulting in serious bodily injury. The Commonwealth alleges that in the early morning hours of December 31, 2020, Metellus and co-defendant, Regina Registre ("Registre"), attacked Roxanne Duncan ("Duncan") first in a vehicle and later in the area of Mattakeeset Street in Mattapan. The government alleges Metellus and Registre beat, stabbed, and set Duncan on fire. Metellus moves to suppress statements he made to Boston Police Department ("BPD") detectives on March 8, 2021, while at the BPD station in Hyde Park.
            The court conducted an evidentiary hearing on January 3, February 7, and February 9, 2024. The Court heard testimony from Norton Police Officers Ashley Cibotti ("Cibotti"), Scott Sweeting ("Sweeting"), and Boston Police Detective Daniel Hooley ("Hooley"). The court also received ten exhibits in evidence. The defendant did not testify and introduced no exhibits.
            As is more fully explained below, after thorough consideration of the submissions and arguments of counsel, and the evidence presented at the hearing, Metellus's motion to suppress
statements is DENIED.
 
                                                            -1-
 
FINDINGS OF FACTS
            The Court makes the following findings which are based on the credible evidence produced at the hearing and the reasonable inferences that the Court has drawn from the evidence. In making these findings, the Court finds that the testimony of Cibotti, Sweeting, and Hooley was truthful and accurate on the relevant and material points. Thus, the Court credits their testimony in its entirety.
            On December 30, 2020,[1] Duncan sustained life-threatening injuries following an attack during which she was stabbed and set aflame. Due to the severity of her injuries , BPD's Homicide Unit was initially assigned to the investigation. Duncan's medical condition impaired the progress of the investigation.[2] Duncan survived the attack, however, and after regaining consciousness, the investigation was reassigned to District E-18 detectives. Hooley and Sergeant Detective Eric Krause (" Krause") participated in the investigation.
            On March 5, 2021, E-18 detectives obtained arrest warrants for Metellus and Registre in connection with the assault of Duncan. On March 8, 2021, officers from the Norton Police Department, including Sweeting, assisted members of the Boston Police Fugitive Unit and District E-18 detectives in executing the arrest warrant for Metellus at 2 Holmes Avenue in Norton, Massachusetts. At approximately 9:55AM, officers observed Metellus exiting the building and placed him under arrest without incident. Norton police transported Metellus to the Norton Police Department for a so-called "courtesy" booking. Sweeting assisted in the transport.
 
--------------------------------------------
 
[1] The indictment alleges an offense date of December 31, 2020, and the Commonwealth's memorandum describes the incident as occurring " in the early morning hours" of that date. The slight discrepancy between the date of offense in the indictment date and the date elicited from Hooley at the hearing is not material to the court's determination.
[2] Duncan was in a coma.
 
                                                            -2-
 
            At 10: 19AM, Cibotti began the courtesy booking process, which included obtaining basic demographic information from Metellus and photographing him but did not involve fingerprinting the defendant. Cibotti, who did not participate in the arrest of the defendant, had recently graduated from the police academy in July 2020, and the system used to book the defendant was new.[3] Metellus remained seated on a bench and handcuffed to the wall during most of the booking process. He was not placed in a holding cell while at the Norton police station. During the booking process, the defendant did not ask for an attorney, he was not questioned about the crime for which he had been arrested, and he did not make any statements about the crimes.
            Cibotti observed the defendant from a distance of approximately ten feet through an opening in a wall. Metellus did not appear to be under the influence of narcotics. At no time did Cibotti see the defendant nodding off or falling asleep. Metellus understood and responded appropriately to questions asked of him by Cibotti. Cibotti had no difficulty understanding him, and Metellus did not stray off topic. The defendant did not complain about his health or intoxication issues, and had he done so Cibotti would have alerted Emergency Medical Services ("EMS") to perform a check on his wellbeing.
            At 10:15AM, prior to Cibotti asking any booking questions, Sweeting advised Metellus of his rights under Miranda and his right to use the telephone from a written form used by Norton police. The defendant acknowledged that he understood his Miranda rights and indicated in that form he did not wish to speak to police. See Exhibit 3. The defendant also acknowledged in that same form his right to use a telephone. Sweeting described Metellus as being very cooperative. Cibotti observed Officer Sweet reviewing the Miranda and telephone rights form
 
--------------------------------------------
 
[3] The use of this new system resulted in at least one glitch - the booking form indicates that Metellus was not photographed when, in fact, he was.
 
                                                            -3-
 
with Metellus. She described the tone of the officers' interaction with the defendant as respectful.
            Sweeting acknowledged that the defendant asked to use the telephone.[4] Metellus wanted someone to come to the Norton police station and retrieve his cellphone and debit cards from him. Sweeting then communicated Metellus ' s desire to use the phone to Lieutenant James Franco. Franco stated in substance , "let me check with Boston." Lieutenant Franco then left the room for a short time and returned to inform Sweeting that Metellus could use the phone at BPD. There is no dispute that the defendant did not use a phone at the Norton police station, nor was he given access to a telephone to make a call during the time he was there.
            Although present at the Norton Police Department, Hooley and Krause did not participate in the defendant' s booking. Once the courtesy booking was completed, Krause arranged for the defendant's transportation in a properly equipped police cruiser from Norton to District E-18 in Hyde Park.[5] Officers estimated it could take between 30 and 45 minutes to drive from Norton to Hyde Park, depending on traffic conditions. Metellus was not transported directly from the Norton Police Department to Attleborough District Court (or another district court) for arraignment because the criminal complaint initiated out of Suffolk County and the assistant district attorney assigned to the case wanted Metellus arraigned in Boston.
            Officers Castro Basille and Irene Castillo transported the defendant to the BPD in Hyde Park for a full booking process. Once there, Officer Basille informed Hooley that the defendant wanted to speak to detectives.[6] Hooley was not aware at the time the defendant had been advised
 
--------------------------------------------
 
[4] Cibotti could not recall whether Metellus asked to use the telephone.
[5] E-18 detectives' vehicles were not equipped to transport prisoners.
[6] Officer 13asille has since retired. I le did not testify at the hear ing on the motion to suppress.
 
                                                            -4-
 
 of his Miranda rights at the Norton Police Department and had declined to speak to investigators. Hooley then prepared the interview room at BPD, which was outfitted with a so-called "case cracker system," to allow for audio and visual recording of police interviews. Hooley and Krause began the interview of Metellus at 11:57AM.[7] They informed Metellus that the interview would be audio and video recorded. The three men were seated at a table in the interview room. Metellus was handcuffed to a chair during the interview with his dominant hand free. A plexiglass divider separated the defendant from the detectives due to COVID-19 concerns.
            At approximately 11:58AM, Hooley and Krause advised Metellus of his Miranda rights verbally and in writing (Exhibit 6). The video recording shows Metellus reviewing the Miranda rights form with the detectives. The defendant signed the form acknowledging that he understood his rights. He agreed to speak to the detectives.
            In activating the case cracker system, however, Hooley inadvertently activated only the video recording function and not the audio recorder. Another detective alerted Hooley and Krause that the audio recording was not operating, and Krause turned the audio recorder on approximately 14 minutes and 50 seconds into the interview.[8] Hooley explained that he activated the system with one switch which resulted in a red light illuminating outside the interview room. Hooley erroneously believed both the video and audio functions of the system activated when the red light illuminated. He later learned it meant only the video recording feature of the system had been initiated. A separate switch outside the interview room controlled the audio function of the system. Hooley had been a detective for approximately three months at
 
--------------------------------------------
 
[7] The case cracker system indicated that the interview began at 12:57PM, but Hooley testified that the system erroneously recorded the time as occurring one hour later due to daylight savings time . The defense did not contest this representation, and the court credits Hooley' s explanation for the time differential.
[8] The defendant was not informed that the audio had not recorded up to that point.
 
                                                            -5-
 
the time of his interview of Metellus. The interview of the defendant was the first suspect Hooley interviewed as a detective in that room.
            An excerpt from an investigative summary report prepared by Hooley and admitted in evidence describes the exchange between detectives and the defendant during the time the audio was not engaged and recording. See Exhibit 8. Hooley's report explains how he reviewed the Miranda rights form line-by-line with Metellus and instructed the defendant to place his initials next to each line if he understood each right. After completing the form, Metellus asked if he could get some kind of consideration for telling detectives what happened with Duncan. Krause and Hooley informed the defendant they could not promise or offer him any rewards for his statements, but that they would provide his interview to the District Attorney's Office and to the court.
            The court has reviewed the recorded interview in its entirety. See Exhibit 4. When the audio recorder is activated, the first recorded words of the defendant are, "I'm willing to help you guys with the case...." He specifically  states, "I  know you guys can't make promises.  It's up to the DA." Metellus then continues speaking to the detectives for another hour and nine minutes during which time he makes various admissions regarding his knowledge of and involvement in the attack of Duncan. While speaking to detectives, Metellus asks "what can the DA do for me?  That's the main question[,]" and repeats "I'm willing to help you guys."   He also mentions his past involvement with the criminal justice system, and displays some knowledge of criminal law, noting " in a crime that's about to [be] commit[ted], you can still be tried for conspiracy or ...  accessory before the fact.       "
            During the interview, Metellus's responses to questions were on topic, though sometimes vague and evasive. Hooley had no difficulty understanding Metellus. He did not belie ve the
 
                                                            -6-
 
defendant was "under the influence" and noted no drugs or drug-related paraphernalia were found on Metellus' s person. His speech was clear, and he made appropriate eye contact. The defendant did not ask for a lawyer, nor did he tell detectives that he did not wish to speak with them. If he had, Hooley would have ended the interview and noted the date and time he deactivated the recording system.
            Metellus began the full booking process at BPD at 1:24PM, approximately four minutes after the conclusion of his interview with Krause and Hooley. See Exhibit 9. He was afforded an opportunity to use a telephone and availed himself of that opportunity. Although there is no evidence as to the time at which Metellus placed a call (see Exhibit 10) , Hooley noted that the phone call usually ends the booking procedure. The defendant was not arraigned in West Roxbury District Court on March 8, 2021, immediately after his booking, due to the time at which the booking process ended and Hooley's understanding that the court would not arraign Metellus at that time of the day. The detectives took no further statements from Metellus after completion of the booking procedure. Metellus was arraigned the next morning on March 9, 2021.[9]
RULINGS OF LAW
            A. Custodial Interrogation
            An individual is entitled to Miranda warnings when that individual is in custody. See Commonwealth v. Libby, 472 Mass. 37, 41-42 (2015); Commonwealth v. Morse, 427 Mass. 117 , 122-1 23 (1998). There is no dispute Metellus was in custody at the time he spoke to BPD detectives on March 8, 2021, and therefore the recitation of Miranda rights was required.
 
--------------------------------------------
 
[9] Police arrested Registre at approximately 8:30PM on March 8, 2021, after Metellus had been booked at BPD.
 
                                                            -7-
 
            B. Miranda Waiver and Voluntariness of Statements
            There is also no dispute Metellus was advised of his Miranda rights at the Norton Police Department and again at the District E-18 station in Hyde Park. Nor is there a dispute that Metellus spoke to BPD detectives after being advised of his rights.
            "The voluntariness of the waiver on the basis of Miranda and the voluntariness of the statements on due process grounds are separate and distinct issues but they arc both determined in light of the totality of the circumstances and they share many of the same relevant factors." Commonwealth v. Edwards, 420 Mass. 666,673 (1995); sec also Commonwealth v. Newson, 471 Mass. 222, 229 (2015) (voluntariness of Miranda waiver and statements are distinct but the test for both is essentially the same). Under the totality of the circumstances test, the court considers "'all of the relevant circumstances surrounding the interrogation and the individual characteristics and conduct of the defendant,' including 'promises or other inducements , conduct of the defendant, the defendant's age, education, intelligence and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency (whether the defendant or the police), and the details of the interrogation, including the recitation of Miranda warnings."' Newson, 471 Mass. at 230, quoting from Commonwealth v. Tremblay, 460 Mass. 199, 207 (2011); Commonwealth v. Hoyt, 461 Mass. 143, 153 (2011).
            To determine the validity of a Miranda waiver and the voluntariness of any subsequent statements, the court must ask "(l) whether there has been a knowing and intelligent waiver of the Miranda requirements; and (2) whether, in the totality of the circumstances, the statements given were the product of a free will, and not the result of coercion or intimidation." Commonwealth v. Martinez, 458 Mass. 684, 691 (2011) (internal citations omitted).
 
                                                            -8-
 
            Here, Metellus asserts his Miranda waiver was invalid and his statements involuntary, due to a combination of the following circumstances: (1) he initially refused to speak with the Norton police; (2) he was delayed access to a telephone after his arrest; (3) he was not arraigned until the day after his arrest; (4) the audio from the beginning of his interrogation was not recorded; (5) he was purportedly intoxicated at the time of his interrogation; and (6) he was unlawfully refused his right to counsel. The court addresses each specific argument seriatim from first to last below, but bases its determination on all of the circumstances supported by the credible evidence.
            (1) Defendant's Invocation of his Right to Remain Silent
            Metellus argues that following his refusal to speak with police officers in Norton, the Boston Police violated his previously invoked right to remain silent by interrogating him in Boston. The court finds this argument unavailing.
            The resumption of questioning after a defendant initiates contact with police does not violate a defendant's right to remain silent. See Commonwealth v. Groome, 435 Mass. 20 I, 217, 219(2001); see also Commonwealth v. Gonzalez, 487 Mass. 661, 671 (2021) (citations omitted) (if defendant reinitiates further communication with police, "[t]he Commonwealth has the burden of proving beyond a reasonable doubt that subsequent events indicated a voluntary, knowing, and intelligent waiver of the right to have counsel present and of the right to remain silent"). Here, police officers scrupulously honored the defendant's invocation of his right to remain silent at the Norton Police Department. No police officer questioned Metellus after he invoked his right to remain silent in Norton.[10] Only after Metellus told Officer Basille on the
 
--------------------------------------------
 
[10] The court disagrees with the Commonwealth's position that because Metellus's invocation of his right to remain silent was made to a Norton police officer and documented on Norton police stationary, the invocation of that right only attached to the defendant's interactions with Norton police, and not detectives of the I3PD. The court interprets the word "us," on the form (Exhibit 3) as police in general, not just Norton police officers. Acceptance of the
 
                                                            -9-
 
way from Norton to Boston that he wished to speak to investigators did questioning begin. There fore, questioning Metellus after he unilaterally communicated his desire to speak with investigators did not violate his right to remain silent. See Groome, 435 Mass. at 217. BPD detectives were not required to turn a deaf ear to the defendant's overtures.
            In addition, "there is no per sc rule proscribing the resumption of questioning after a defendant has invoked his or her right to be free from interrogation." Commonwealth v. Rivera, 424 Mass. 266, 269 (1997). Rather, the Supreme Judicial Court ("SJC") has identified factors used by the United States Supreme Court in Michigan v. Mosley, 423 U.S. 96 (1975) to determine "whether the person's right to be free from interrogation, once exercised, was 'scrupulously honored' before questioning resumed." Commonwealth v. Howard, 469 Mass. 721, 735 (2014) (citations omitted). These factors include whether upon a suspect's invocation of his right to remain silent "the police ( l) had immediately ceased questioning; (2) resumed questioning ' only after the passage of a significant period of time and the provision of a fresh set of warnings;' and (3) limited the scope of the later interrogation 'to a crime that had not been subject of the earlier interrogation."' Id., citing Commonwealth v. Clarke, 46l Mass. 336, 334 (2012), quoting Mosley, 423 U.S. at l 06. Other factors include "whether the same officer conducted both the interrogation where the suspect invoked the right [to remain silent] and the subsequent interrogation, and whether the venues differed; ... [and] the persistence of the police in wearing down the suspect's resistance in order to change his mind." Commonwealth v. Callender,81 Mass. App. Ct. 153, 157 (2012) (citations omitted).
 
--------------------------------------------
 
government's proposition in this case, in theory, would sanction I3PD detectives' commencement of questioning Metellus at Norton Police Depat1ment immediately after the defendant asse11ed his right to refuse to speak to investigators. It could be problematic, to say the least, in multi-agency investigations and expose a defendant to interrogation by officers from different departments even after unequivocally asserting the right to remain silent.
 
                                                            -10-
 
            In the present case, police did not question the defendant after he invoked his right to remain silent in Norton. The interview of Metellus at BPD took place approximately one hour and forty-five minutes after Metellus acknowledged receiving his Miranda rights in Norton. See Rivera, 424 Mass. at 269 (even if defendant invoked rights during booking process, in totality of circumstances, defendant waived fresh set of Miranda rights three and one-half hours later). The interrogation here occurred in a different venue with officers from a different department. Hooley and Krause administered a fresh set of Miranda warnings to Metellus before they questioned him for the first time about his involvement in and knowledge of the assault of Duncan. Metellus acknowledged verbally and in writing that he understood his rights both in Norton and at the BPD. See Commonwealth v. Murphy, 442 Mass. 485,494 (2004) (while not dispositive , a signed Miranda waiver form is evidence that the defendant's waiver was made knowingly, intelligently, and voluntarily).
            Being 44 years old at the time, Metellus had prior ongoing involvement in the criminal justice system dating back to 1995. See Exhibit 7. He expressed a general understanding of how the cooperation process works and expressed a desire to help investigators with the case. There is no evidence that Norton or Boston police officers promised Metellus anything or engaged in tactics to wear down his resistance to questioning. See Howard, 469 Mass. at 735; see also Callender, 81 Mass. App. Ct. at 157. Neither Sweeting nor any other Norton police officer were involved in the interview of Metellus or the investigation of the assault on Duncan. The court concludes, in the totality of circumstances, that BPD detectives did not violate the defendant's constitutional right to remain silent when, of his own volition, Metellus initiated contact with Boston detectives, expressed a desire to speak with them about the assault, executed a Miranda waiver verbally and in writing, and volunteered information to investigators.
 
                                                            -11-
 
            (2) Access to a Telephone
            Metellus also argues that his waiver of Miranda was invalid, and his statements should be suppressed because his rights under G. L. c. 276, § 33A were violated when he was delayed access to use the telephone until after his interrogation in Boston. This argument is also unavailing.
G. L. c. 276, § 33A provides:
The police official in charge of the station or other place of detention having a telephone wherein a person is held in custody, shall permit the use of the telephone, at the expense of the arrested person, for the purpose of allowing the arrested person to communicate with his family or friends, or to arrange for release on bail, or to engage the services of an attorney. Any such person shall be informed forthwith upon his arrival at such station or place of detention, of his right to so use the telephone, and such use shall be permitted within one hour thereafter.
            In interpreting the statute, the SJC has stated that only an intentional violation of the statute requires suppression of evidence, and the defendant bears the burden of establishing an intentional violation. See Commonwealth v. Walker, 466 Mass. 268,278 (2013). As such, suppression is not an appropriate remedy where a delay in using a telephone was not designed to gain inculpatory information. See Commonwealth v. Johnson, 422 Mass. 420, 429 (1996) (affirming denial of motion to suppress statements where two hour delay in booking and using telephone was not designed to gain inculpatory information but to allow officers involved to be present at the booking); Commonwealth v. Alicea, 428 Mass. 711, 716 (1999) ("[i]f intentional police misconduct deprives a defendant of the statutory right, suppression is required"). The defendant has not met his burden in this case.
            Here, the evidence reflects that the defendant was informed of his right to use the telephone during his courtesy booking in Norton.  Metellus wanted to use the phone at the Norton police station to have someone come to Norton and pick up his cellphone and debit cards,
 
                                                            -12-
 
 but he was about to be transported (and was transported) to Boston for a full booking procedure shortly after the courtesy booking in Norton finished. [11] The transportation from Norton to Boston following an abbreviated courtesy booking could take as little as thirty and as much as forty-five minutes depending on traffic, and Metellus had asserted his right to remain silent before the courtesy booking process had even begun. The court finds the delay at Norton in allowing Metellus access to a phone until he reached Boston to call someone to retrieve his phone and debit card was not intentionally done to gain inculpatory information from Metellus. There is nothing to suggest Boston police colluded with No1ton police officers, who were not involved in the underlying criminal investigation, to deny Metellus access to a telephone in order to gain incriminating information from the defendant.
            It was only when Metellus arrived in Boston that Officer Basille informed Hooley that the defendant wanted to speak to detectives. Operating on this information, Hooley and Krause immediately prepared the interview room and conducted the interrogation of Metellus. The delay in accessing a telephone at Boston, therefore, was due to Metellus wishing to speak to detectives. Four minutes after the interview, Metellus was booked and given access to a telephone. It cannot be said in these circumstances that the delay was the product of an intentional effort by the police to gain inculpatory information from Metellus. See Walker, 466 Mass. at 278-279; see also Johnson, 422 Mass. at 429. Applying the exclusionary rule in these circumstances would do nothing to further the rule' s purpose of deterring intentional misconduct by police. See Alicia, 428 Mass. at 716 (where no penalty prescribed in G. L. c. 276, § 33A, the SJC has "grafted an exclusionary rule to it").
 
--------------------------------------------
 
[11] There is no evidence that Metellus expressed a desire to use the phone to contact an attorney.
 
                                                            -13-
 
            (3) Defendant's Arraignment
            Metellus also argues that his statements should be suppressed as involuntary because he was detained in violation of Mass. R. Crim. P. 7(a)(l) as he was arraigned twenty-four hours after his arrest. The Court disagrees.
            Mass. R. Crim P. 7(a)(l) provides:
A defendant who has been arrested and is not released shall be brought for arraignment before a court if then in session; and if not, at its next session. A defendant who receives a summons or who has been arrested but is thereupon released shall be ordered to appear before the court for arraignment on a date certain.
            Rule 7(a)(l) codifies Massachusetts case law that requires that a defendant who is arrested be brought to a court for arraignment "as soon as reasonably possible after arrest." Commonwealth v. Dubois, 353 Mass. 223,226 (1967) (citations omitted). The unreasonableness of a delay is determined on a case-by-case basis in light of all of the circumstances.
Commonwealth v. Perito, 4 I 7 Mass. 674, 680 (l 994); see Commonwealth v. Banuchi, 335 Mass. 649, 656-57 (1957). The requirement that the defendant is to be brought to court as soon as reasonably possible is to prevent both unlawful detentions and unlawfully obtained statements.
See Commonwealth v. Cote, 386 Mass. 354, 361 (1982) (where a judge determines that delay was used by police to procure a confession such a statement should be suppressed).
            In the instant case, Metellus was arrested by Norton police on March 8, 2021, at approximately 9:55AM. Metellus was  then transported to the  Norton  Police  Department  and began the courtesy booking process at  I 0:I 9AM.  The courtesy  booking  made  perfect  sense as the arrest occurred within the Norton police's territorial jurisdiction and Norton  officers assisted with the arrest. Neither the Norton Police nor the BPD transported Metellus to the Attleborough District Court (or some other court) for arraig1m1ent because the criminal complaint originated in
 
                                                            -14-
 
Suffolk County and the assistant district attorney assigned to the case wanted Metellus arraigned in Boston. At the time this decision was made, the police and the prosecutor had no indication that Metellus wanted to speak to investigators. In fact, Metellus had asserted his right to remain silent at the Norton Police Department. Had the defendant not expressed a desire to speak to investigators in Boston, Metellus likely would have been transported to West Roxbury District Court that day and arraigned following a full booking at the BPD in Hyde Park.[12]
            When Metellus arrived in Boston, however, Hooley and Krause, operating off the belief that Metellus wished to speak with detectives, prepared an interview room and began to interview him soon after he arrived at 11:57AM. Approximately four minutes after the conclusion of the interview, Metellus began the full booking process at BPD at 1:24PM. When the booking process was complete, Hooley understood that it was too late in the day to have Metellus arraigned at West Roxbury District Court, and so he was arraigned the following morning on March 9, 2021. No further attempts were made to interview Metellus after completion of the full booking process.[13]
            In these circumstances, it was not unreasonable for Metellus to be arraigned during the Court's next session on the morning of March 9, 2021 . See Perito, 417 Mass. at 680; Mass. R. Crim. P. 7(a)(l). The defendant was not unlawfully detained, nor did investigators unlawfully obtain a statement from him because of any delay associated with Metellus' s arraignment.
 
-------------------------------------------
 
[12] The defendant's suggestion that police should have transported him from the Norton Police Department to appear in Attleborough District Court (or some other court) and then sought process to have him appear in West Roxbury District Court likely would have taken  longer than simply taking him directly to West Roxbury.  Again, investigators had received no indication from Metellus in Norton that he wished to speak with them , and BPD also needed to verify his identity before appearing in court, which was not part of the courtesy booking process.
[13] Metellus's reliance on Common wealth v. Rosario, 422 Mass. 48 (1996) is misplaced. The defendant was interviewed at BPD within six hours of his arrest after he expressed a desire to speak with investigators.
 
                                                            -15-
 
(4) Failed Recording of Interrogation
            Metellus seeks suppression of his statements on the ground that the first fifteen minutes of the audio recording of his interview with police went unrecorded. There is no general rule in Massachusetts requiring suppression of a defendant's statement because of law enforcement' s failure to electronically record a custodial interrogation. Sec Commonwealth v. Diaz, 422 Mass. 269, 271-273 (1996); see also Commonwealth v. Pina, 430 Mass. 66, 70-71 (1999) (upholding judge's decision not to suppress defendant's statements where statements were neither recorded nor reduced to writing). Rather, the SJC has held a defendant is entitled, upon request, to a specific cautionary instruction at trial. Commonwealth v. DiGiambattista, 442 Mass. 423, 447- 448 (2004). And the defendant further is entitled to cross-examine Hooley and Krause at trial on the failure to record the initial portion of his interview and argue lack of voluntariness of his waivers and statements. Pina, 430 Mass. at 71.
            Metellus nonetheless asserts the detectives' failure to record the audio of the first fifteen minutes of his interrogation indicates that his waiver of Miranda rights and subsequent statement to detectives were involuntary. While the lack of a recording may bear on the voluntariness of a defendant's waiver and subsequent statements, it is up to the judge to determine whether the testimony of the officer's describing the defendant' s statements is credible. See Pina, 430 Mass. at 70-71.
            The court credits Hooley's explanation that the failure to audio record the initial portion of the interview was unintentional and due to his lack of familiarity with how the system operates. The credible evidence further establishes that Hooley and Krause initially introduced themselves to Metellus and gave him a copy of the BPD Miranda rights form. Hooley then orally reviewed the rights form with Metellus, who placed his initials after each line on the form.
 
                                                            -16-
 
See Exhibit 6. Although the police inadvertently failed to capture the audio for the first fifteen minutes of the interrogation, the video of the interrogation shows Metellus reading the Miranda form, acknowledging his Miranda rights, and signing the waiver of these rights, which serves to corroborate Hooley's testimony. Additionally, Metellus was not informed of the failure to audio record the beginning of interview.  When the audio was activated, Metellus's first recorded words were, "I'm willing to help you guys with the case", further corroborating  that his waiver of rights and subsequent statements were voluntary. Finally, the defendant was informed of his Miranda rights by Sweeting less than two hours before meeting with Hooley and Krause, and his experience with the criminal justice system indicates he was aware of these rights and knew that the police could not " make any promises ... It's up to the DA." Given this evidence, the lack of recorded audio for the beginning portion of the interrogation does not render Metellus's Miranda waiver invalid or his statements involuntary.
            (5) Defendant's Intoxication
            Metellus also claims that his waiver of his Miranda rights was involuntary , and his statements should be suppressed because he was intoxicated at the time of the interrogation at BPD. This argument is unsupported by evidence.
            To support his claim of intoxication Metellus alleges in an affidavit attached to his motion to suppress that he ingested "a significant amount of cocaine" the night before his interview, as well as "two or more lines of cocaine" at 5AM on the day he was arrested. Defendant's Affidavit at ¶¶ 3, 8. However, the defendant's affidavit was not (nor could it be) admitted in evidence at the hearing.  The purposes of the affidavit requirement of Mass. R. Crim. P. 13 are"(1) to give the judge considering the motion a statement of anticipated evidence, in reliable form, to meet the defendant' s initial burden of establishing the facts necessary to support
 
                                                            -17-
 
his motion, and (2) to provide the Commonwealth with fair notice of the specific facts relied on in support of the motion set forth in a form, i.e., under oath, which is not readily subject to change by the affiant." Commonwealth v. Santiago, 30 Mass. App. Ct. 207, 212-213 (1991) (citation omitted). A judge should not admit a defendant's Rule 13 affidavit in evidence at a motion to suppress hearing. Commonwealth v. Mubdi, 456 Mass. 385, 389 n.4 (2010), overruled on other grounds, Commonwealth v. Delossantos, 492 Mass. 242, 249 (2023); sec also Commonwealth v. Ellerbe, 430 Mass. 769, 776 n.12 (2000).
            A judge, moreover, can discredit claims by a defendant that he was impaired at the time statements were made. See Walker, 466 Mass. at 274-275; see also Commonwealth v. LeBlanc, 433 Mass. 549,554 (2001). Having viewed the recording of the defendant's interview with detectives, the court rejects Metellus's claim he was under the influence of drugs. The recorded interrogation reveals that Metellus responded appropriately to questions from Hooley and Krause, asked his own questions, and engaged in a coherent back and forth exchange throughout the interrogation. He shows no outward signs of being under the influence of drugs.
            In any event, police are entitled to rely on a suspect's outward behavior to determine whether he is capable of giving a voluntary statement. See Walker, 466 Mass. at 274-75; see also Pina, 430 Mass at 70-71. Each officer came in close contact with Metellus, at least one of whom (Hooley) spent an extended period of time with him. None of them concluded Metellus appeared intoxicated or under the influence of drugs or alcohol. The defendant was coherent and lucid during his interactions with police in Norton and Boston. At no time did he stray off topic, nod off, fall asleep, or seem disoriented or detached from reality. See LeBlanc, 433 Mass. at 554 (discussing outward appearance of sobriety and intelligible responses to questioning). The defendant did not complain about his health or intoxication issues, and had he done so officers
 
                                                            -18-
 
would have alerted EMS. Finally, the police here found no evidence of drugs or drug paraphernalia on Metellus when he was booked at the Norton Police Station. See Exhibit F (NPD Property form). The court therefore discredits Metellus' s claim that he was sufficiently impaired at the time of the interrogation to render his Miranda waiver and subsequent statements involuntary.
            (6) Defendant's Right to Counsel
            Metellus alleges that he unambiguously invoked his right to counsel and was repeatedly denied the opportunity to consult with counsel before and during his interrogation at BPD. However, there is no evidence in the record that Metellus invoked his right to counsel, and the only support for these assertions comes from Metellus's own affidavit which is not evidence. Mubdi, 456 Mass. at 389 n.4. Consequently, the Court finds that defendant' s right to counsel was not violated.
CONCLUSION AND ORDER
            Considering all the relevant circumstances in this case, the court concludes the Commonwealth has proved beyond a reasonable doubt that Metellus knowingly, voluntarily, and intelligently waived his Miranda rights, and that his voluntary statements to police were the product of a rational and unencumbered mind and not the result of physical or psychological coercion.
            It is therefore ORDERED that the Defendant's Motion to Suppress Custodial Statements Attributed to the Defendant (Paper No. 78) is DENIED.